**UNITED STATES OF AMERICA**
**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

---

CHARLES DEXTER INGRAM,

        Petitioner,

  -vs-

JOE BARRETT,

        Respondent.

Case No. 2:15-11074

Honorable DAVID M. LAWSON

---

| | |
|---|---|
| ATTORNEY GENERAL<br>Bill Schuette,<br>Appellate Division<br>G. Mennen Williams Bldg,<br>PO BOX 30212,<br>Lansing, Michigan 48909 | PETITIONER, In Pro se<br>CHARLES DEXTER INGRAM #825646<br>Cooper Correctional Facility<br>3100 Cooper Street<br>Jackson, Michigan<br>49201 |

---

FILED

FEB - 3 2017

CLERK'S OFFICE
U.S. DISTRICT COURT

**PLAINTIFF'S 1st AMENDED PETITION FOR HABEAS CORPUS**

**PURSUANT TO 28 U.S.C. § 2254**

Respectfully Submitted

*Charles Ingram*

Petitioner In Pro se
Charles Dexter Ingram #825646

Dated: January 31, 2017

## Habeas Corpus Standard of Review

### Pursuant to 28 U.S.C. § 2254

Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), codified at 28 U.S.C. § 2254, in reviewing a state prisoner's application for writ of habeas corpus, this court shall not grant the petition on any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application, of clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings.

28 U.S.C. § 2254(d)(1) and (2).

Additionally, accordance with § 2254(e)(1), the applicant bears the burden of rebutting the presumption of correctness by clear and convincing evidence where the State court made a finding on the factual issues.

Therefore, federal courts are bound by a state court's adjudication of a petitioner's claims unless the state court's decision was contrary to or involved an unreasonable application of clearly established law. **Franklin v. Francis**, 144 F.3d 429 (6th Cir. 1998). Additionally, federal habeas courts must presume the correctness of state court factual determinations. **Cremeans v. Chapleau**, 62 F.3d 167, 169 (6th Cir. 1995).

The Supreme Court in **Williams v. Taylor**, 529 U.S. 362 (2000),

announced the rule of analysis that federal courts are to use when reviewing a petition for habeas corpus pursuant to § 2254. The Supreme Court held that the AEDPA has stated that clearly established federal law is the law that is established at the time the state conviction became final. Id.,, 529 U.S. at 380.

In defining the contrary to requirement, the Supreme Court stated there are two separate analysis a federal court of review most use that, if found apparent, would justify the granting of a habeas petition. The first analysis under the contrary to clause states that [a] state court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. Id.,, at 405.

Secondly, the **Williams** Court stated [a] state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this court and nevertheless arrives at a result different form our precedents. Id.,, at 406.

The court in determining the unreasonable application of clearly established Federal Law clause state:

> That state-court judgements, must be upheld unless, after the closest examination of the state-court judgment, a federal court is firmly convinced that a federal constitutional right has been violated. Our difference is as to the cases in which, at first blush, a state-court judgment seems entirely reasonable, but thorough analysis by a federal court produces a firm conviction that that judgment is infected by erroneous judgment is unreasonable within the meaning of the Act even though that conclusion was not immediately apparent. Id.,, at 389.

The Supreme Court further stated the statute directs federal courts to attend to every state-court judgment with the utmost care, but it does not require them to defer to the opinion of every reasonable state-court judge on the content of federal law. Id., And, that after carefully weighing all the reasons for accepting a state court's judgment, a federal court is convinced that a prisoner's custody...violates the Constitution, that independent judgment should prevail. Id.,

In other words, a federal court may grant relief when a state court has misapplied a 'governing legal principle' to 'a set of facts different from those of the case in which the principle was announced'. **Wiggins v. Smith**, 539 U.S. 510, 520 (2003) (citing **Lockyer v. Andrade**, 538 U.S. 63, 76 (2003)).

The Supreme Court in **Panetti v. Quarterman**, ____U.S. ___; 127 S. Ct. 2842 (2007), has upheld the ruling that the AEDPA does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied'. Id.,, 127 S. Ct. at 2858 (citing **Carey v. Musladin**, 549 U.S. ___; 127 S. Ct. 649, 656 (2006)). In this ruling, the Supreme Court has granted the federal courts more latitude in making the determination, without identical facts, that a defendant's constitutional rights have been violated during the state court criminal proceedings.

Lastly, the Supreme Court has reemphasized that a state court's application of clearly established law is acceptable, even if it is likely incorrect, so long as it is reasonable. **Wright v. Van Patten**, ___ U.S. ___, 128 S. Ct. 743 (2008).

**Sixth Circuit Standard:**

The Sixth Circuit held in <u>Abela</u> v. <u>Martin</u>, 380 F.3d 915 (6th Cir. 2004), where a state court fails to issue a written opinion acknowledging the constitutional claims raised, that is construed as a decision on the merits of the claim.

Additionally, the Sixth Circuit has also held where the state court failed to address the constitutional claims on the merits, the habeas court must apply a modified AEDPA deference review. **Vasquez v. Jones**, 486 F.3d 135 (6th Cir. 2007).

Under this standard, the court conducts a 'careful' and 'independent' review of the record and applicable law, but cannot reverse 'unless the state court's decision is contrary to or an unreasonable application of federal law'. Id., 141. (citation omitted).

## STATEMENT OF FACTS

Petitioner appealed as of right his jury trial convictions of third-degree criminal sexual conduct, MCL 750.520d(1)(b) (force or coercion), and two counts of fourth-degree criminal sexual conduct, MCL 750.520e(1)(b) (force or coercion). The Michigan Court of Appeals proclaimed the evidence was sufficient to support petitioner's convictions, also ruling, the jury's verdict was not against the great weight of the evidence, and the trial court did not abuse its discretion by denying petitioner's motion in limine to admit evidence that was inadmissible under the rape-shield statute, MCL 750.520j(1), they affirm.

Petitioner's convictions stem from the sexual assault of "BJ" in the basement of a home that petitioner was renovating. BJ testified that her father worked for petitioner and that she sometimes accompanied her father and was paid for work that she performed. According to BJ, petitioner grabbed her hands and held them behind her back while he pulled her pants down, squeezed her breasts, and vaginally penetrated her with his penis. Petitioner testified that the sexual encounter was consensual.

Petitioner first argued that **the evidence was insufficient to establish that he used force or coercion to accomplish the sexual assault and that, accordingly the trial court erred by denying his motion for a directed verdict of acquittal.** The COA review this issue de novo, as a challenge to the sufficiency of the evidence. **People v. Ericksen,** 288 Mich App 192, 195; 793 NW2d 120 (2010). They examine the evidence in a light most favorable to the prosecution and determine whether a rational trier of fact

- 1 -

could have found that every essential element was proven beyond a reasonable doubt. Id. at 196. They apply the same standard in reviewing the trial court's denial of a motion for a directed verdict of acquittal. **People v. Hartuniewicz,** 294 Mich App 237, 242; 816 NW2d 442 (2011). Circumstantial evidence and reasonable inferences that may be drawn from that evidence can constitute sufficient proof of the elements of an offense. **People v. Carines,** 460 Mich 750, 757; 597 NW2d 130 (1999). The inferences to be drawn from the evidence and the weight to accord to those inferences are matters for the trier of fact to determine. **People v. Hardiman,** 466 Mich 417, 428; 646 NW2d 158 (2002). The trier of fact must also determine questions involving credibility. **People v. Harrison,** 283 Mich App 374, 378; 768 NW2d 98 (2009).

The prosecution may establish the element of force or coercion by showing that the petitioner overcame the victim "through the actual application of physical force or physical violence." MCL 750.520b(1)(f)(i); MCL 750.520e(1)(b)(i); see also MCL 750.520d(1)(b). "[T]he prohibited 'force' encompasses the use of force against a victim to wither induce the victim to submit to sexual penetration or to seize control of the victim in a manner to facilitate the accomplishment of sexual penetration without regard to the victim's wishes." **People v. Carlson,** 466 Mich 130, 140; 644 NW2d 704 (2002).

Here, BJ testified that petitioner pushed her over and held her hands behind her during the assault. Petitioner contends that the assault could not have occurred as BJ described because he "did not have enough available hands" to restrain BJ while

forcibly touching her and removing her clothes as she maintained. Thus, in essence, petitioner contends that BJ's version of events is "patently incredible or defies physical realities." **People v. Lemmon**, 456 Mich 625, 643; 576 NW2d 129 (1998) (quotation marks and citation omitted). Petitioner also argues that, considering the size of the house, someone would have heard BJ scream as she claimed she did.

The Michigan Court of Appeals decided that, "'nothing about BJ's description of the attack can be characterized as "patently incredible" or contrary to "physical realities.'" Defense counsel challenged BJ's description of the assault, and she continued to maintain that petitioner restrained her while at the same time engaging in sexual contact and sexual penetration with her. During police interview, petitioner denied having sexual intercourse with BJ, but he testified that he did engage in sexual intercourse with her, but that the intercourse was consensual. It was ultimately for the jury to determine whose testimony to believe, and that court will not interfere with the jury's role in assessing witness credibility. **Harrison**, 283 Mich App at 378. Moreover, a victim's testimony alone is sufficient to establish criminal sexual conduct, and such testimony need not be corroborated. MCL 750.520h; **People v. Phelps**, 288 Mich App 123, 132; 791 NW2d 732 (2010). Again, the COA ruled, the evidence was sufficient to support petitioner's convictions, and the trial court did not err by denying petitioner's motion for a directed verdict of acquittal.

Petitioner next argues that **the trial court erred by denying**

his motion for a new trial because **the jury's verdict was against the great weight of evidence.** A verdict contravenes the great weight of the evidence if "the evidence preponderates so heavily against the verdict that it would be a miscarriage of justice to allow the verdict to stand." **People v. Lacalamita**, 286 Mich App 467, 469; 780 NW2d 311 (2009). A new trial is generally permissible when the evidence does not reasonably support the verdict, and the verdict was "more likely the result of causes outside the record, such as passion, prejudice, sympathy, of some other extraneous influence." Id.

Petitioner contends that his own testimony prejudiced the jury and undermined the verdict. In particular, petitioner argues that, **during cross-examination, the prosecution elicited testimony regarding his womanizing behavior, which caused the jury to dislike him.** The record may suggest that it was petitioner, rather than the prosecution, who introduced the subject. During questioning regarding petitioner's claim that he paid BJ for sexual intercourse, petitioner testified that women usually paid him for sexual intercourse because he knows "how to treat a woman." Petitioner now realizes that he cannot claim an error that predicated on this matter that. The court is correct, "To hold otherwise would allow petitioner to harbor error as an appellate parachute." **People v. Fetterly,** 229 Mich App 511, 520; 583 NW2d 199 (1998). In any event, it is unlikely that petitioner's brief account of his self-proclaimed sexual prowess caused the jury to convict him based on reasons other than the evidence concerning the sexual assault itself. In short, the

Michigan Court of Appeals, concluded that the evidence did not preponderate so heavily against the verdict that a miscarriage of justice would result if the verdict was allowed to stand. Petitioner respectfully disagrees. **Lacalamita**, 286 Mich App at 469. The petitioner strongly disagrees with the trial court's assessment that the court did not err by denying petitioner's motion for a new trial.

Finally, Petitioner argued that **the trial court erroneously denied his motion in limine to allow evidence of BJ's prior sexual history with third parties.** The Michigan Court of Appeals reviewed for, "an abuse of discretion a trial court's decision to admit evidence". **People v. Gursky,** 486 Mich 596, 606; 786 NW2d 579 (2010). An abuse of discretion occurs when the court's decision "falls outside the range of principled outcomes." **People v. Feezel,** 486 Mich 184, 192; 783 NW2d 67 (2010) (quotation marks and citation omitted).

Generally, all relevant evidence is admissible at trial. MRE 402. "Relevant evidence is 'evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence'". MRE 401. "Although relevant, evidence may be excluded if it probative value is substantially outweighed by the danger of unfair prejudice...." MRE 403. MCL 750.520j(1), commonly known as the rape-shield law, provides:

> Evidence of specific instances of the victim's sexual conduct, opinion evidence of the victim's sexual conduct, and reputation evidence of the victim's sexual conduct shall not be admitted [in a criminal sexual conduct prosecution] unless and only to the extent that the judge finds that the following proposed evidence is

material to a fact at issue in the case and that its
inflammatory or prejudicial nature does not outweigh
its probative value:

   (a) Evidence of the victim's past sexual conduct with
      the actor.

   (b) Evidence of specific instances of sexual activating
      showing the source or origin of semen, pregnancy,
      or disease.

During trial petitioner sought to admit:

   (1) testimony from a man who claimed to have had a
      sexual encounter with BJ, who then falsely accused
      him of impregnating her and began stalking him;

   (2) testimony from the man's supervisor that he had
      spoken with BJ about the stalking; and

   (3) testimony from a third man claiming that BJ "would
      hit on anyone" and had "tried to get with him." The
      third man's proposed testimony constituted
      reputation evidence that was inadmissible under MCL
      750.520j(1).

In addition, the supervisor's proposed testimony was
derivative of the man who claimed to have had a casual sexual
encounter with BJ, evidence of which was also inadmissible under
the rape-shield statute.

Further, Petitioner again respectfully disagrees that the
proffered evidence was not relevant to whether BJ consented to
the particular sexual encounter at issue as petitioner claimed.
Therefore, he truly believes that the evidence presented is:

   (1) resulted in a decision that was contrary to, or
      involved an unreasonable application, of clearly
      established Federal law, as determined by the
      Supreme Court of the United States; or

   (2) resulted in a decision that was based on an
      unreasonable determination of the facts in light of
      the evidence presented in the State court
      proceedings.

The trial court did in fact abuse its discretion by denying
petitioner's motion in limine to introduce the evidence mentioned
herein.

- 6 -

## Issue I

**PETITIONER CONVICTION IS A PRODUCT OF ONE BEING INCARCERATED WHOM IS ACTUALLY INNOCENT THE ACTS THAT OCCURRED PETITIONER HOLDS WHERE CONSENSUAL AND PETITIONER DID NOT HAVE THE MALICE INTENT OR THE MENS REA OF THE ACT THAT HE WAS CONVICTED OF. THE PROSECUTION FAILED TO ESTABLISH THESE SPECIFIC ACT OF INTENT CAUSING A MISCARRIAGE OF JUSTICE ALSO SOME TESTIMONY WAS A PRODUCT OF PERJURY AND RESULTING IN A NAPUE VIOLATION AND ONE WAS CONVICTED BY THE VIOLATION AND DENIED A FAIR TRIAL.**

## ARGUMENT

The reasoning for this claim is more than a mere point of reiterating what is testified to during the trial proceedings [a mans life is in the balance as him being actually innocent of a crime he did not commit]. The testimony was not merely contained with discrepancies but actual perjury on the part of the complaining witness and possibly others to demonstrate the actual perjury one sees testimony of material facts materials facts are relied upon as actual testimony directly relating to the alleged crime that was committed Ms. Bobbie Johnson testified to petitioner raping her in a basement. This was one of petitioner's rental properties as to statements of material fact Ms. Johnson stated that she was covered in bruises from the attack. This is contradicted by physical evidence and petitioner sees as perjury. The medical doctor whom examined Ms. Johnson stated there was one small bruise about the size of a finger pad on her arm. This is inconsistent to what Ms. Johnson testified to it is perjury and prejudicial. As advocates we place so much on 12 persons not educated in the law. Then put them in a place to hold their

emotions and see the facts through them. Sometimes this results in the jury getting it wrong. None of the evidence presented to an act as Ms. Johnson has described as to a violent attack. She testified to being forced around and bent over and forced to have sex. In fact there was NOT ANY medical conclusion to confirm these type of allegations. Ms. Johnson testified to her screaming while this alleged attack occurred. She even explicitly said she was hoarse afterwards. There was another individual in the home upstairs whom testified he could hear everything being moved downstairs and NEVER heard any screams. This also could be considered perjury on Ms. Johnson part. Of course, the question would come into who is telling the truth. Maybe Mr. Allen is lying of course all the testimony is being reviewed. Ms. Johnson testimony differed from Mr. Allens, Ms. Cooper, her father, Bobby Johnson and the scientific proof. Also to included her testimony was different then petitioner. Petitioner prays that this court will look at all physical facts equally to the testimonial. Petitioner an older man holding a person arms behind their back while striping their close off, then performing an act of rape while bracing a young female against a counter of some sort so petitioner allegedly braced a person both arms pulled their clothes off all the while getting ready to rape this person with no difficulty at all. Would not some injuries be inflicted in a forced rape? None of Ms. Johnsons testimony is supported by physical evidence. Now on the other hand petitioner side of events are more plausible then anyone on the prosecutions side of course not the parts where testimony reflected the untruth that

Ms. Johnson expressed.

So even when this issue was partially raise it was not raised under a **Napue** violation **Napue v. Illinois**, 360 US 264; 79 S Ct 1173; 3 LE2d 1217 (1959). There was clear contradictory sworn statement on a material issue **Smith v. Woronoff**, 75 Mich App 24 (1977). These material issues resulted in perjured testimony **Burks v. Egeler**, 512 F12 F2d 221 (1975). This truly impaired petitioner the ability to get a fair trial **People v. Alter**, 255 Mich App 194, 205; 659 NW2d 667 (2003).

When reviewing an issue of a claim on actual innocence all evidence must come into play. Examples of evidence which may establish factual innocence include credible declarations of guilty by another, trustworthy eyewitness accounts and exculpatory scientific evidence **Pitts v. Morris**, 85 F3d 348 350 51 (8th cir 1996). According to **Schlup** 513 US at 324 (referring to Exculpatory scientific evidence. Trustworthy eyewitness accounts, or critical physical evidence). See generally, 395 F3d 577 (6th Cir 2005). Now normally rehashing evidence used at trial is insufficient to support a claim of actual innocence, **Spencer v. White**, 265 F. Supp. 2d 813, 818 (E.D. Mich 2003). But in this case the Napue violations comes into question of complete reliability of the testimony which is erroneous because the physical evidence demonstrates this fact. So if an act is consensual then the conviction lacks any type of malice or the necessary men rea of the specific act charged and conviction, **People v. Anderson**, 111 Mich App 671 (1980). The proof must show and proving the mens rea of all degrees, **People v. Nye**, 479 Mich

- 9 -

112 (2007). SO the testimony as a whole could not and did not establish a conviction of rape because the testimony by Ms. Johnson simply did not have the scientific support as she did testify to in trial under oath committing perjury in violation of Napue.

## SUMMARY

Seeing the body of this case, the prosecution failed to show the act of rape with the evidence or testimony. The plausibility of Mr. Ingram's testimony is supported by the facts as a whole. Behaviors do play a role in a conviction of this magnitude. More testimony demonstrates after this allege rape there where several people on the porch included the alleged victim and Mr. Ingram joking and relaxing with no more than a simple normal day as any other. A person's ability to pretend that a rape did not occur especially when both parties are near each other after the chain of events is hard to conceive. Only one time did Ms. Johnson state she was in the car the entire time.

### ISSUE II

DEFENDANT'S CONVICTIONS SHOULD BE VACATED AND HE SHOULD BE
GRANTED A NEW TRIAL BECAUSE HE WAS SUBJECTED TO DOUBLE
JEOPARDY IN VIOLATION OF THE FIFTH AMENDMENT OF THE UNITED
STATES CONSTITUTION, WHERE HE WAS SUBJECTED TO MULTIPLE
PROSECUTIONS FOR THE SAME OFFENSE.

## PERTINENT FACTS THAT SUPPORT DEFENDANT'S CLAIM OF A DOUBLE JEOPARDY VIOLATION

At Defendant's Preliminary Examination (PE), Complainant did not give any
time sequence as to when the claimed assaults occurred. She testified that
Defendant touched her "vaginal area" and that "First it was on top and then
he, I mean I was pushing his hand back but he found a way to get under there."
(PE, p 17). She noted that Defendant, at this juncture, touched her breasts,
with his bare hands, and that he touched the skin around her vaginal area.
(PE, pp 17-18). Complainant further testified that this occurred while facing
Defendant. (PE, p 18).

Complainant testified that after the previously cited events, Defendant
turned her around, and entered her vagina with his penis. (PE, pp 18-19).

Based on the preceding information, the Court bound Defendant over for
trial on one count of Criminal Sexual Conduct in the third degree (CSC-3), and
two counts of Criminal Sexual Conduct in the fourth degree (CSC-4). (PE, p
49). The basis of the bind over was as follows:

> Well, Miss Johnson did testify um, that the Defendant
> touched her on both the breast and in the vagina area,
> which I assume, is the county (sic) two and three. And she
> also (sic) that she was essentially raped, which I assume
> is count one. So her testimony is adequate at least to
> meet the probable cause standard at this point in the
> proceedings. So I am going to bind the defendant over to
> stand trial on all three counts. (PE, p 49).

At Defendant's trial, Complainant testified that the touching lasted "no

longer than ten minutes", and it consisted of touching her breasts and vagina through her clothes. (Trial [T], Volume [Vol.] II, pp 41-42). This was on direct examination by the prosecution. She noted that, after this, Defendant bent her over a "countertop", and penetrated her vagina with his penis. (T, Vol. II, p 42).

On Cross examination by the defense, Complainant testified that she and Defendant were in the basement for a total time of "10, 15 minutes or so", and they were there for no more than "five minutes" before the sex occurred. (T, Vol. II, p 51).

When the Court gave its instructions to the jury on what it must consider on the CSC-3 charge, it stated:

> First, that the defendant engaged in a sexual act that involved entry into Bobbie Johnson's genital opening by the defendant's penis. Any entry, no matter how slight, is enough. It does not matter whether the sexual act was completed or whether semen was ejaculated. (Emphasis added).
> Second, that the defendant used force or coercion to commit the sexual act. Force or coercion means that the defendant either used physical force or did something to make Bobbie Johnson reasonably afraid of present or future danger. (Emphasis added). (T, Vol. III, pp 115-116).

As it related to count II, the CSC-4 charge at issue, the Court instructed the jury as follows.

> First, that the defendant intentionally touched Bobbie Johnson's genital area or the clothing covering that area. (Emphasis added).
> Second, that this touching was done for sexual purposes or could reasonably be construed as having been done for sexual purposes.
> Third, that the defendant used force or coercion to commit the sexual act. Force or coercion means that the defendant either used physical force or did something to make Bobbie Johnson reasonably afraid of present or future danger. (Emphasis added). (T, Vol. III, p 116).

**THE STANDARDS FOR DETERMINING IF THERE IS A DOUBLE JEOPARDY VIOLATION AS IT RELATES TO THE PROHIBITION AGAINST MULTIPLE PROSECUTIONS FOR THE SAME OFFENSE**

The Court of Appeals, in People v Uphaus, 275 Mich App 158, 173; 737 NW2d

519 (2007), notes the standards for determining how to ascertain if there was a double jeopardy violation, as it relates to multiple convictions for the same offense.

> The double jeopardy clauses of the federal and state constitutions protect a defendant against both multiple prosecutions for the same offense, as well as multiple punishments for the same offense. Id. What constitutes the same offense for purposes of the double jeopardy clauses is a matter of legislative intent. Id. at 450-451. [People v Calloway, 469 Mich 448; 628 NW2d 733 (2003)] This Court utilizes the so-called "unit of prosecution" test as an aid in determining whether the Legislature intended to permit multiple convictions for the same conduct under a single statute. People v Wakeford, 418 Mich 95, 107; 341 NW2d 68 (1983). The correct "unit of prosecution" is determined by analyzing the statute at issue to determine its primary purpose. Id. at 111. (Emphasis added). (Headnote omitted).

Calloway, supra at 469 Mich 450, citing People v Sturgis, 427 Mich 392, 400; 397 NW2d 783 (1986), states:

> The Court can enforce the constitutional prohibition against multiple prosecutions through judicial interpretation of the term "same offense" as intended by the framers of the constitution.

In short, it is the statutory elements of the claimed double jeopardy charges that determine if it is the "same offense". People v Ream, 481 Mich 223, 235-238; 750 NW2d 536 (2008).

**DEFENDANT'S POSITION AS TO WHY, IN THE INSTANT CASE, THE CHARGE OF CSC-3 AND CSC-4 CONSTITUTES DOUBLE JEOPARDY BECAUSE THEY WERE THE "SAME OFFENSE"**

As noted in People v Bush, 187 Mich App 316, 326; 466 NW2d 736 (1991):

> The constitutional protections against double jeopardy prevents a defendant from being convicted of two offenses where one is a necessarily or cognate lesser included offense of the other. (Emphasis added). (Citations omitted).

Bush goes on to give a definition of what constitutes a necessary and a cognate lesser included offense, at 326-327, stating:

> The common-law definitions of lesser included offense is that the lesser must be such that it is impossible to

- 13 -

commit the greater without first having committed the
lesser. 4 Wharton, Criminal Law and Procedure, § 1799.
This definition includes only necessarily included lesser
offenses. This definition, however, is generally conceded
to be unduly restrictive, and thus most jurisdictions,
including Michigan, have statutes that are broadly
construed to permit conviction of "cognate" or allied
offenses of the same nature, under sufficient charge.
These lesser offenses are related and hence "cognate" in
the sense that they share several elements, and are the
same class or category, but may contain some element not
found in the higher offense. [People v Ora Jones, 395 Mich
379, 387; 236 NW2d 461 (1975)]. (Emphasis in original).

Since Bush, as cited, the Michigan courts have made it clear that only
necessary lesser included offenses can constitute a double jeopardy violation,
for multiple convictions, because the lesser offense must have the same
"elements" as the higher offense. People v Garland, 286 Mich App 1, 4-6; 777
NW2d 732 (2009); People v Ream, 481 Mich 223, 235-242; 750 NW2d 536 (2008);
People v Franklin, 298 Mich App 539, 545-547; 828 NW2d 61 (2012).

Defendant is basing his claim that there was a double jeopardy violation,
as it relates to the prohibition of double convictions for the "same offense",
where he was charged, and convicted, of CSC-3 and CSC-4, where the CSC-4 count
II was based on the claim that Defendant was using "force or coercion" when he
touched Complaint's "genital area". (T, Vol. III, p 116).

Defendant begins by pointing out that there are several ways that a person
can violate MCL 750.520d, CSC-3. The one Defendant was charged with, and was
the prosecution's claim, was that he used "Force or coercions" to "accomplish
the sexual penetration". MCL 750.520d(b). As to the charge of CSC-4, for
touching Complainant's genital area, this was also based on "force or
coercions". MCL 750.520e(1)(b).

It is Defendant's position that the "elements" of the CSC-4, the lesser
charge, contains the same "elements" of the higher charge, CSC-3. Defendant
points out that this must be so because it would have been necessary for him

- 14 -

to touch Complainant's genital area if he was to have any "entry into Bobbie Johnson's genital opening by" his penis, by force, if the claimed act had occurred. According to the prosecution, and the charges, both the touching and penetration were done with "force or coercion". Thus, having the same elements.

Further, even if the jury had believed that Defendant had touched the clothing of Complainant in the genital area, as instructed, this was also necessary if he had committed the alleged act, and was, supposedly, done with "force or coercion". However, it should be noted that we do not know which theory the jury based its verdict.

Defendant contends that he has shown that all the elements of the lesser charge had to be committed in order to commit the higher charge. Thus, there is a double jeopardy violation, pursuant to the Fifth Amendment of the United States Constitution, because the lesser has all the elements of the greater, and they occurred at the same time. People v Armstrong, 100 Mich app 423, 428; 298 NW2d 752 (1980).

Lastly, Defendant points out that the Court of Appeals, in People v Makela, 147 Mich App 674, 678-680; 383 NW2d 270 (1985), noted, in a case that is very similar to Defendant's, that the only difference in CSC-3 and CSC-4, when "force or coercion" is used, is that of the penetration in CSC-3. In short, in that case, and Defendant's case, all the elements of the lesser charge, CSC-4, are contained in the higher, CSC-3.

**A DOUBLE JEOPARDY VIOLATION BASED ON MULTIPLE PROSECUTIONS FOR THE SAME OFFENSE IS A JURISDICTIONAL DEFECT THAT MAY BE RAISED AT ANY TIME, AND MAY NOT BE PROCEDURALLY BARRED**

The Michigan Supreme Court, in People v Carpentier, 446 Mich 19, 47; 521 NW2d 195 (1995), stated:

> ...Thus, a jurisdictional defect or its equivalent has been found when the defendant raises the issue of improper personal jurisdiction, improper subject matter

- 15 -

jurisdiction, double jeopardy,.... (Emphasis added).
(Footnotes omitted).

Further, where there is a jurisdictional defect, that issue can never be procedurally barred. This is especially important in the instant case, where Defendant is seeking relief via a Motion For Relief From Judgment, pursuant to MCR 6.500 et. seq. This was specifically addressed in Carpentier, supra at 446 Mich 27, where the Supreme Court stated:

> It is clear that, by its own terms, the "good cause" and "actual prejudice" prerequisites of MCR 6.508(D)(3) need not be satisfied where a defendant properly alleges a jurisdictional defect in a prior proceeding that resulted in conviction and sentence. It is also apparent that MCR 6.508 - which articulates the procedures for obtaining postappeal relief - permits jurisdictionally based challenges to be raised after a criminal appeal has been exhausted. (Emphasis in original).

After stating the preceding, the Court noted, citing People v Johnson, 396 Mich 424, 442; 240 NW2d 729 (1976), stated: "Defendant may always challenge whether the state had a right to bring the prosecution in the first place". Because of this concept, other Michigan courts have noted why jurisdictional defects may not be procedurally barred, and may be raised at anytime. It is because it goes to the very authority of a court to bring a defendant to trial at all. Moses v Dep't of Corrections, 274 Mich App 481, 486; 736 NW2d 269 (2007). See also, People v Price, 23 Mich App 663, 669; 179 NW2d 177 (1970).

Defendant believes that he has shown that his issue of double jeopardy constitutes a jurisdictional defect, that it cannot be procedurally barred, and he may now raise it.

**WHAT RELIEF DEFENDANT SHOULD RECEIVE FOR THE VIOLATION OF THE PROHIBITION OF MULTIPLE PROSECUTIONS FOR THE SAME OFFENSE, WHICH CONSTITUTES A JURISDICTIONAL DEFECT**

Once it is shown that there is a jurisdictional defect, the entire trial is void, because (in this case, a double jeopardy violation for multiple

prosecutions for the same offense occurred.) "its practical result is to prevent a trial from taking place at all,...." People v Alvin Johnson, 396 Mich 424, 441; 240 NW2d 729 (1976). See also, Hinton v Parole Board, 148 Mich App 235, 244-245; 383 NW2d 626 (1986); Carpentier, supra at 446 Mich 25, citing Johnson v Zerbst, 304 US 458, 468; 58 S Ct 1019; 82 L Ed 1461 (1938).

## CONCLUSION

Defendant, again, wishes to emphasis that he is making a claim that the double jeopardy claim he is making is that of multiple prosecutions for the same offense, and not as it relates to multiple sentencing for the same offense, under the Fifth Amendment of the United States Constitution. This is an important distinction as to what standard is to be applied to determine if there was a violation, and what relief is available. See Grady v Corbin, 495 US 508; 110 S Ct 2084; 109 L Ed 2d 548 (1998), applying the Blockburger test to double jeopardy claims of multiple prosecutions, as opposed to multiple punishments.

Defendant believes he fulfills the standards in Grady v Corbin, supra, necessary to receive relief on his issue.

As to relief, because the double jeopardy violation resulted in multiple prosecutions for the same offense, "it prevent[ed] the trial from taking place at all", and thus, it was void. Alvin Johnson, supra at 396 Mich 441; Hinton, supra at 148 Mich App 244-245; Carpentier, supra at 446 Mich 28.

Since the trial was void, the only relief that is justified is that all Defendant's convictions be vacated, and he be granted a new trial on all of the charges, and he so requests.

- 17 -

## ISSUE III

DEFENDANT DID NOT RECEIVE THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHEN COUNSEL FAILED TO OBJECT WHEN THE COURT GAVE A JURY INSTRUCTION THAT PERMITTED THE JURY TO FIND HIM GUILTY EVEN IF THEY WERE NOT IN UNANIMOUS AGREEMENT ON EACH CHARGE.

**PERTINENT FACTS THAT SUPPORT DEFENDANT'S CLAIM THAT THE COURT GAVE AN ERRONEOUS AND/OR MISLEADING JURY INSTRUCTION PERTAINING TO THE UNANIMOUS VERDICT INSTRUCTION.**

Before the prosecution's opening statement, the Court gave some preliminary jury instructions. As it related to the unanimous jury instruction, the Court stated:

> ...A verdict must be unanimous. That means that every juror must agree on it, and it must reflect the individual decision of each juror. (Trial [T], Volume [Vol.] II, p 17).

After completion of Defendant's trial, and counsels' closing arguments, the Court gave its final jury instructions. It impressed upon the jury:

> It is my duty to instruct you on the law. You must take the law as I give it to you.... At various times, I have already given you some instructions about the law. You must take all my instructions together as the law you are to follow. (Emphasis added). (T, Vol. III, p 107).

Later, the Court instructed the jury:

> The defendant is charged with three counts, that is, with one count of the crime of third degree criminal sexual conduct and two counts of the crime of fourth degree criminal sexual conduct. These are separate crimes, and the prosecutor is charging that the defendant committed all of them. You must consider each crime separately in light of all the evidence in the case. (Emphasis added). (T, Vol. III, p 115).

Immediately after the above, the Court instructed the jury:

> You may find the defendant guilty of all or any

- 18 -

combination of these crimes or not guilty of any crime.
(Emphasis added). (T, Vol. III, p 115).

Near the end of its instructions, the Court, once again, informed the jury:

> A verdict in a criminal case case must be unanimous.
> In order to return a verdict it is necessary that each of
> you agrees on that verdict. (T, Vol. III, p 119).

At the conclusion of the instructions, the Court asked both trial counsels, in chambers: "First of all, does anyone have any objections to the instructions?" Both counsels responded, "No, Your Honor." (T, Vol. III, p 121).

It appears that the Court gave, and adapted, Standard Jury Instruction, Second Edition, (CJI2d) 3.20, which states:

> (1) The defendant is charged with _____ counts,
> that is, with the crimes of _____ and _____.
> These are separate crimes, and the prosecution is charging
> that the defendant committed both of them. You must
> consider each crime separately in light of all the
> evidence in the case.
> (2) You may find the defendant guilty of all or [any
> one/any combination] of these crimes [, guilty of a less
> serious crime,] or not guilty.

**PREISSUE STATEMENTS THAT SHOULD BE CONSIDERED WHEN ADDRESSING ISSUE**

Defendant notes that if the Court does not accept his "ISSUE I", double jeopardy violation claim, then this issue is dispositive.

Further, Defendant would request the Court to review this issue, not from the view and legal acumen and knowledge of a professional jurist, such as is the Court, but that of the lay people who made up the jury, and have no expertise in the law.

**EVEN IF A COURT GIVES A STANDARD JURY INSTRUCTION (CJI2d), THE INSTRUCTION CAN STILL CONSTITUTE ERROR**

The fact that the Court gave the standard jury instruction, CJI2d 3.20, does not automatically make it error free. The Court of Appeals, in People v

- 19 -

Ullah, 216 Mich App, 669, 677; 550 NW2d 568 (1996) reflects this premise, where it states:

> The trial court gave an instruction that was virtually identical to CJI2d 20.27. The Michigan Criminal Jury Instructions, however, do not have the official sanction of the Michigan Supreme Court. People v Petrella, 424 Mich 221, 277; 380 NW2d 11 (1985). Their usage is not required and trial judges should examine them carefully to ensure their accuracy and appropriateness to cases before them. Id. Indeed, MCL 768.29; MSA 28.1052 provides that it is the duty of the trial court to instruct the jury with regard to the law applicable to the case. Similarly, MCR 6.414(F) provides that the court must instruct the jury as required and as appropriate. (Emphasis added).

In another case, citing Patrella, the Court of Appeals, in People v Stephan, 241 Mich App 482, 495-496; 616 NW2d 188 (2000), stated:

> ...The prosecutor's specific request for relief here is that we disavow CJI2d 7.12 as an incorrect statement of law. The Criminal Jury Instructions are not officially sanctioned by the Supreme Court. People v Sullivan, 231 Mich App 510, 520, n1; 586 NW2d 578 (1998). Where a Criminal Jury Instruction does not accurately state the law, it will be disavowed by the courts. Id. For example, in Sullivan, id., this Court "expressly" disavowed CJI2d 16.9(2), a manslaughter instruction, because it misstated Michigan law. Id. Furthermore, our Supreme Court has held that it is "error for the trial court to give an erroneous or misleading jury instruction on an essential element of the offense" including when the misleading instruction is taken from the Criminal Jury Instructions. People v Petrella, 424 Mich 221, 277; 380 NW2d 11 (1985). (Footnote omitted).

See also, People v Anderson, 166 Mich App 455, 466-467; 421 NW2d 200 (1988).

The gist of the preceding is that regardless of the Standard Jury Instructions, a trial court's instructions must "fully and fairly present the case to the jury in an understandable manner." (Emphasis added). People v Moore, 189 Mich App 315, 319; 472 NW2d 1 (1991), citing People v Jones, 419 Mich 577, 579; 358 NW2d 837 (1984). The Supreme Court, in People v Anstey, 476 Mich 436, 453; 719 NW2d 579 (2006), emphasizes this even more, citing People v Henry, 395 Mich 367, 373-374; 236 NW2d 489 (1975), stated:

> "'[I]t is the duty of the circuit judge to see to it

- 20 -

> that the case goes to the jury in a _clear_ and intelligent
> manner, so that they may have a _clear_ _and_ _correct_
> understanding of what it is they are to decide, and he
> should state them fully the law applicable to the facts.'"
> (Emphasis added).

Defendant believes that the following illustrates that CJI2d 3.20, as given, is either erroneous or misleading to the extent that it, as given by the Court, permitted the jury to reach a verdict that was not unanimous, as required by the Michigan and United States Constitutions.

## HOW A COURT GIVES A JURY INSTRUCTION ON THE REQUIREMENT THAT A VERDICT MUST BE UNANIMOUS IS DETERMINED BY THE RELATIONSHIP BETWEEN THE VARIOUS CHARGES

A court may give a general unanimity jury instruction where there are alternative theories to committing a charged offense. People v Gadomski, 232 Mich App 24, 31-32; 592 NW2d 75 (1998); People v Asevedo, 217 Mich App 393, 395-397; 551 NW2d 478 (1996); People v Johnson, 187 Mich 621, 629; 468 NW2d 307 (1991).

It is Defendant's position that the previously cited line of cases do not apply to this issue, because, if the Court does not accept his double jeopardy claim, he was charged with three separate offenses, and not one charge with alternative means of committing. The Supreme Court, in People v Cooks, 446 Mich 503, 525; 521 NW2d 275 (1994), sets the parameters, for giving, or not giving, a general unanimity instruction, as did the Court in Defendant's case.

> ...a general instruction will be adequate unless 1) the
> alternative acts are materially distinct (where the acts
> themselves are conceptually distinct or where either party
> has offered materially distinct proofs regarding one of
> the alternatives), or 2) there is a reason to believe the
> jurors might be confused or disagree about the factual
> basis of defendant's guilt. (Footnote omitted).

In Defendant's case, the prosecution claimed that there were three different charges and presented, what it believed was "materially distinct proofs". Secondly, Defendant contends that "there is a reason to believe the jurors

might [have been] confused". The jury instruction instruction, CJI2d 3.20, first states that "must [have] consider[ed] each crime separately" and then, immediately, states that they may be considered them in "any combination".

If a jury instruction is given in such a fashion that it would permit a jury to reach a guilty verdict where the jury could have split its vote between the charges and still find a defendant guilty, then the instruction is erroneous. See People v Yarger, 193 Mich App 532, 535-537; 485 NW2d 119 (1992); People v Potruff, 116 Mich App 367, 373-376; 323 NW2d 402 (1982); U.S. v Duncan, 850 F 2d 1104 (CA 6, 1988).

**HOW THE JURY INSTRUCTION COULD HAVE LED THE JURY TO RENDER A GUILTY VERDICT ON LESS THAN A UNANIMOUS CONSENSUS, AND THUS, WAS ERROR**

As pointed out in the pertinent facts section, after the Court instructed the jury that Defendant was charged with "separate crimes" and they "must consider each crime separately", it immediately informed them that they "may find the defendant guilty of all or any combination of these crimes". (Emphasis added), (T, Vol. III, p 115).

The Court did not specifically, Defendant contends, inform the jury that they had to find him guilty of each count. The Court simply informed the jury that they were to "consider" them "separately", not find Defendant guilty of each charge separately, but immediately informed the jury that they could find him guilty of "any combination" of them. Defendant contends that this instruction was either erroneous, confusing, or misleading to a group of people that are not versed in the subtleties of law. As previously noted, the Court of Appeals in Stephan, supra at 241 Mich App 495-496, notes that "it is 'error for the trial court to give an erroneous or misleading jury instruction,'" "including when the misleading instruction is taken from the Criminal Jury Instructions." (Emphasis added). Citing, Sullivan, supra, at 520, n1; and Petrella, supra at 424 Mich 277.

- 22 -

Because the cited part of the jury instruction informed the jury that they could find Defendant guilty of "any combination" of the charged crimes, some jurors could have found him guilty of some of each charge while not agreeing on all of them, and thus, still find him guilty, this is prohibited. Yarger, supra at 193 Mich App 535-537; Potruff, supra at 116 Mich App 373-376; U.S v Duncan, 850 F 2d 1104 (CA 6, 1988).

## THE INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD APPLIED TO TRIAL COUNSEL'S FAILURE TO OBJECT TO THE WAY THE COURT GAVE THE UNANIMOUS JURY INSTRUCTION

Michigan has adopted the standards cited in Strickland v Washington, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984) for determining if a counsel provided the required effective assistance of counsel, under the Sixth Amendment of the United States Constitution. People v Pickens, 446 Mich 298; 521 NW2d 797 (1994); People v Stanaway, 446 Mich 643, 687-688; 521 NW2d 557 (1994). The dual standard that must be met is stated in Strickland, supra at 466 US 687; 104 S Ct 2064:

> ...First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.
>
> ...Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors was so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

See also, Stanaway, supra at 446 Mich 687-688; People v Plummer, 229 Mich App 293, 307; 581 NW2d 753 (1998).

The first standard, for Defendant to prevail on his ineffective assistance of counsel claim, is that he must show that "the performance of counsel was below and objective standard of reasonableness under prevailing professional norms." Plummer, supra at 229 Mich App 307. See Strickland, supra at 466 US 688; 104 S Ct 2065, and Stanaway, supra at 446 Mich 687.

- 23 -

Defendant believes that he fulfills the first requirement of Strickland, because a reasonable trial counsel, given the preceding facts, CJI2d 3.20, and case law, would have recognized that the instruction permitted the jury to not all unanimously agree that Defendant was guilty of each charge, but that some could have voted that he was guilty of some combination of the three, and therefore, find him guilty of all. Yarger, supra at 193 Mich App 535-537; Potruff, supra at 116 Mich App 373-376. A reasonable counsel would have requested the Court to instruct the jury in such a fashion that they would have to all unanimously agree that Defendant was guilty of each charge unanimously, instead of "any combination" of them, to find him guilty.

Defendant believes that he fulfills the first Strickland requirement necessary to show that he did not receive the effective assistance of counsel.

To fulfill the second standard, Defendant must show that trial counsel's failure to object to the cited instruction prejudiced him to the extent that "a reasonable probability exists that, in the absence of counsel's unprofessional errors, the outcome of the proceedings would have been different." Plummer, supra at 229 Mich App 307. What constitutes a "reasonable probability" is not as high as many Michigan courts have applied. The Sixth Circuit Court of Appeals has noted that a "reasonable probability" is not "an absolute certainty", nor is it as high as "a preponderance of the evidence" standard. Magana v Hofbauer, 263 F 3d 542, 550 (CA 6, 2001), citing Williams v Taylor, 529 US 362; 120 S Ct 1495; 146 L Ed 2d 389 (2000).

Defendant believes that he fulfills the second Strickland standard because, if trial counsel would have objected and requested an instruction that made sure that the jury considered each charge independently, and unanimously, instead of in "any combination", there was a "reasonable probability" that the outcome would have been different. Defendant would not

have been convicted of all, or some, of the charges.

Defendant contends that he has fulfilled both the <u>Strickland</u> standards required to show that he did not receive the effective assistance of counsel.

## CONCLUSION

The fact that trial counsel consented to the jury instruction at issue does not waive the claim. In <u>People</u> v <u>Ortiz</u>, 249 Mich App 297, 311-312; 642 NW2d 417 (2002), the Court of Appeals noted that, in that case, trial counsel stated "that he had no objections" to the jury instruction at issue, as in Defendant's case. This did not prevent that defendant from raising the claim that his counsel was ineffective for not objecting. The Court of Appeals ruled that trial counsel was "deemed to have fallen below an objective standard of reasonableness" for not objecting. Unlike Defendant, the defendant in <u>Ortiz</u>, could not fulfill the second standard to receive relief.

Defendant believes that he has shown that Standard Jury Instruction 3.20 should have been modified to comply with Michigan law, and that trial counsel should have objected to how it was given, and requested the necessary corrections. This, Defendant contends, constituted the ineffective assistance of counsel, pursuant to the Sixth Amendment of the United States Constitution.

Defendant requests the Court to vacate all his convictions and grant him a new trial.

## REQUEST FOR EVIDENTIARY HEARING

If the Court does not believe that the record is sufficient to grant Defendant relief on this issue, he is requesting the Court to conduct an evidentiary hearing to ascertain why trial counsel did not object to the jury instruction, as given. <u>People</u> v <u>Plummer</u>, 229 Mich App 293, 308; 581 NW2d 753 (1998), citing <u>People</u> v <u>Ginther</u>, 390 Mich 436, 443; 212 NW2d 922 (1973).

- 25 -

## ISSUE IV

> DEFENDANT DID NOT RECEIVE THE EFFECTIVE ASSISTANCE OF TRIAL COUNSEL WHEN COUNSEL FAILED TO IMPEACH COMPLAINANT WITH HER PRELIMINARY EXAMINATION TESTIMONY, WHEN SHE TESTIFIED AT HIS TRIAL, AND WHEN COUNSEL FAILED TO POINT OUT THE DISCREPANCIES BETWEEN COMPLAINANT'S PRELIMINARY EXAMINATION AND HER TRIAL TESTIMONY, WHERE IT CAME OUT AT TRIAL, AT HER CLOSING ARGUMENT.

**PERTINENT FACTS THAT SUPPORT DEFENDANT'S CLAIM OF INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL FOR FAILING TO IMPEACH AND PRESENT AN ADEQUATE CLOSING ARGUMENT**

The prosecution made a great deal of its claim that between Defendant's and Complainant's stories as to what occurred, and surrounding events before and after the claimed assaults, Complainant was the one telling the truth, and Defendant was not.

Early on, the prosecution noted the importance of comparing the credibility of Complainant to Defendant's. At closing argument, the prosecution noted:

> ...All it comes down to in this case is do you believe Bobbie [Complainant] or do you believe Charles Ingram [Defendant]. (Vol. III, p 78).

The prosecution then noted that Complainant was consistent in her story, which she had told several times, to her "stepmom", to the "ER" personnel, to a "detective", and at Defendant's preliminary examination conducted in 2008. She stated:

> Let's talk about Bobbie [Complainant]. Bobbie has told her story multiple times, and <u>you</u> <u>have</u> <u>heard</u> <u>that</u> <u>throughout</u> <u>this</u> <u>trial</u>. She <u>told</u> her story multiple times. She told it <u>to</u> <u>her</u> stepmom. She told it <u>to</u> <u>the</u> <u>ER</u>. She told it <u>to</u> <u>the</u> <u>detective</u>. She told it on a stand <u>in</u> <u>August</u> <u>of</u> <u>2008</u>, <u>and</u> <u>she</u> <u>told</u> <u>it</u> <u>again</u> <u>on</u> <u>the</u> <u>stand</u> <u>here</u>. (Emphasis added). (Vol. III, p 78).

The prosecution next stated:

> The <u>defense</u> <u>attorney's</u> <u>job</u> in this case is to look at

all of those instances where Bobbie Johnson opened her
mouth and said something to someone, who wrote it down or
transcribed it and look for differences. Where are those
differences speak to a lack of credibility on Bobbie
Johnson's part. And what did the defense attorney find? Do
you remember? Nothing. Nothing. Not one thing. (Emphasis
added). (Vol. III, p 78).

After the preceding, the prosecution then specifically emphasized the lack

of trial counsel's failure to find error between the trial, and the

preliminary examination, relating to Complainant's testimony, stating:

So we try to do what a good defense attorney should
do, he tried to find places, in the preliminary exam
transcript where maybe it wasn't quite exactly the same.
Virtually the same, but maybe not exactly the same words.
Or maybe just it got turned around a little bit. And in
all of those scourings we found one word. One word. And
that one word is, the question was, do you remember the
question, the question was, did you have scarring or
bruising? To which Bobbie [Complainant] said no. And you
saw how these court hearings happen. Questions are asked,
answers are given, and they're happening on top of each
other, right? So maybe when Bobbie said no, she was
talking about the scarring, which she didn't have, okay?
The defense attorney wanted to stop right there. What
happened? I stood up and said wait a minute, lets read to
the bottom. And what does it say on the bottom page? Yes.
That was the extent of what could be found to look at
Bobbie Johnson after three and a half years, to look at
what Bobbie Johnson told ;you what happened and to find
fault with it. That one point in a prelim transcript she
said were there scars or bruising, no. Was there bruising,
yes. Okay. And I would submit to you, first, there's
nothing else, not one thing that they found changed about
her testimony. (Emphasis added). (Vol. III, pp 79-80).

The following are the discrepancies between what Complainant stated at

Defendant's preliminary examination, and his trial.

1) Complainant testified that she had called Defendant to ask if she could
work and earn some money for her outing, and that she called before to ask
Defendant for work. (Preliminary Examination (PE), pp 13-14).

At trial, Complainant testified, on direct examination by the prosecution,
that she talked to her father about going to "Michigan Adventure", he said
it was no problem, but he was not going to give her any extra money. (Vol.
II, pp 38-39). The prosecution then asked her: "So what did you decide to
do?" Her reply was, "Work for Mr. Charles [Defendant]. (Vol. II, p 39).

On cross examination, Complainant was asked: "Is it your testimony that

- 27 -

Mr. Ingram called you over to the house? Or you just came over?" Her reply, "I don't recall." (Vol. II, p 49).

[Note: Defense counsel, at trial, or closing argument, did not point out these differences.]

2) At the preliminary examination, Complainant also testified that Defendant touched her breasts, and "vaginal area", through her clothes. (PE, p 17). She then stated, led by the prosecution, that Defendant also touched her breasts and vagina directly, with no clothes in between. (PE, pp 17-18).

However, when she testified at Defendant's trial, she stated that Defendant only touched her breasts and vagina through her clothes. (Vol. II, pp 41-42).

[Note: Defense counsel did not point out these differences during Defendant's trial, or at closing arguments.]

3) Further, at the preliminary examination, Complainant stated that when Defendant touched her breasts and vagina, they were face to face. (PE, pp 17-18).

When it came to Defendant's trial, however, Complainant stated that any touching of the breasts and vaginal area was while she was bent over facing away from Defendant. (Vol. II, pp 40-41).

[Note: This difference was not pointed out, by defense counsel during the trial, or at his closing trial.]

4) Complainant further testified at the preliminary examination, that during the alleged assault, Defendant did not take her pants all the way off. (PE, pp 18-19, 19-20). They were pulled down to her "calf". (PE. p 45).

During the trial, Complainant was asked, by the prosecution: "Who pulled your clothing off?" (Emphasis added). She responded: "He did. Charles did." (Vol. II, p 42).

She also stated that when she heard Vercia Cooper's voice, and Defendant let her go: "I went and go dressed and went outside and told her she can take me home." (Vol. II, p 43).

[Note: Defense counsel did not impeach Complainant with these differences in testimony at trial or his closing argument.]

5) Complainant also testified, at the preliminary examination, that it was her father's friend that knocked on the upstairs door that caused Defendant to let her go. (PE, p 20). When this occurred, she stated that she "went outside and set in the car." (PE, p 22).

At the trial of Defendant, Complainant testified that she had called for a ride home, after Defendant allegedly assaulted her. (Vol. II, p 40).

[Note: This difference was never pointed out at trial, or closing argument, by defense counsel.]

6) At the preliminary examination, Complainant testified that when she ran upstairs, when the alleged assault was interrupted, she met Vercie Cooper, after hearing her upstairs, and Cooper told her that there were "some people outside for you," and that she went to them and got a certificate from them. (PE, pp 23-25).

At the trial, Complainant testified that she went directly to the car, with Verci Cooper, and there was no mention of going to talk to those who were waiting for her "outside". (Vol. II, pp 43, 55-56, 57).

[Note: Defense counsel did not point out, to the jury, this difference during the trial, or at his closing argument.]

7) At the preliminary examination, Complainant testified that when she came out of the house, after the alleged assault, she went immediately to Vercie Cooper's car, started crying, that Defendant came to the car, and talked to her, and at that time, Cooper was still in the house. (PE, p 26).

At the trial, Complainant testified that she and Cooper walked to the car together, she told Cooper what had occurred, and they left. (Vol. II, pp 43, 55-56, 57).

[Note: This difference in testimony was not pointed out to the jury during the trial, or at defense closing argument.]

8) Further, at the preliminary examination, Complainant testified that it was some "six hours" after the alleged assault before she told anyone what had has occurred, as related to the alleged assault, and that was to Vercie Cooper. (PE, pp 27-28).

At Defendant's trial, Complainant was asked: "And then you got in the car and then you immediately told her [Vercie Cooper] what happened?" She replied: "Yes". (Vol. II, p 56). (See also, Vol. II, pp 43, 55, 57).

[Note: Defense counsel did not point out this difference during Defendant's trial or at his closing argument.]

9) Complainant testified that she did not tell anyone, other than Vercie Copper, what had occurred until the next day, at the hospital, at the preliminary examination. (PE, pp 29-30).

At the trial, however, she testified that the first time her father was informed, as to the claimed assault, was immediately after Defendant left the house the night of the alleged assault. (Vol. II, p 59).

[Note: Defense counsel did not point out, at trial, this difference between the preliminary examination testimony, and trial, even though he impeached Complainant with it from other testimony at trial. This difference was not mentioned at defense counsel's closing argument.]

10) At the preliminary examination, Complainant stated she knew to save her clothes from the alleged assault because her mom had been raped and told

her what to do. She stated: "Cause my mom had been raped and she told me
what do do cause I called my mom." (PE, pp 39, 40).

At Defendant's trial, she testified that she knew to save her clothes
because a friend of hers had been raped. (Vol. II, p 60).

[Note: This difference was not pointed out by defense counsel either
     during the trial or at his closing argument.]

11) Further, at the preliminary examination, Complainant testified that when
they were at the "little blue counter", Defendant told her to "turn
around, [and] I wasn't, wasn't fin" to say no or try to dip cause, I mean
I didn't know what he was gonna try to do or hit me or whatever."
(Emphasis added). (PE, p 18).

However, at the trial, she stated: "I was pushed over the cabinet, and he
was like you know..." (Vol. II, p 40).

The prosecutor asked Complainant: "And then he pushes you over a
counter?". She responded: "Uh-huh. Because it had counters, like a
countertop." (Vol. II, p 42).

[Note: Defense counsel never pointed this difference out at trial or his
     closing argument.]

12) At the preliminary examination, the following questions and answers took
place, as it relates to Complainant calling for help, during the alleged
assault, to the painter who was working upstairs:

     Q Now the um, the painter upstairs there; right?

     A Yes.

     Q And the painter based on your scenario is there the
       entire time, the entire evening that you are there;
       isn't that right?

     A Yes.

     Q So did you holler out and tell the painter or someone
       help me? (Emphasis added).

     A No. (Emphasis added).

     Q Did you say anything to anyone, tell, did you tell
       Ingram, based upon your scenario if we were to believe
       that, did you tell him to stop?

     A Yes I did.

     Q And but you said it very quietly, you whispered?

     A No I didn't whisper, I mean, I wasn't saying it out
       wasn't saying it loud but I was like stop. He, I mean he

could hear me. (Emphasis added).

Q I see.

But you don't think that ah, it won't (sic) loud enough
for anyone else in the house to heard (sic) then; is
that right? (Emphasis added).

A No. (Emphasis added).

Q I see.

Your answer is no what?

A It wasn't.

Q Wasn't loud enough?

A (no verbal answer)

Q Wasn't loud enough for anyone else to hear it? (Emphasis
added).

A No. (Emphasis added). (PE, pp 37-38).

At Defendant's trial, when the same subject was broached, the following
occurred:

Q And you know Mr. Allen [painter] was upstairs, correct?

A Yes.

Q You didn't yell out for Mr. Allen, did you?

A I didn't know Mr. Allen's name.

Q Well you didn't yell out hey help me or anything, did
you?

A Who -- I mean, I'm yelling in the basement, no, stop. If
you can't hear that, then what? (Emphasis added).

Q So you are yelling in the basement? I'm just asking,
were you --

A I'm supposed to be quiet and not try to defend myself?

THE COURT: Ma'am, were you yelling or not? (Emphasis
added).

THE WITNESS: Yes, I was yelling. No one helped me.
(Emphasis added).

- 31 -

BY MR. HOFFMAN:

Q Okay. So you were yelling.

A I'm ready to get off the stand.

Q Ma'am, I know this is difficult, but we have to get through this.
  So you were yelling? (Emphasis added).

A Yes. (Emphasis added).

Q And what were you yelling? (Emphasis added).

A Like I said, no and stop. (Emphasis added).

Q And you were yelling this loud enough for somebody upstairs to hear you?

A I was yelling. My throat was hurtin'. (Emphasis added).

Q You were yelling, and your throat was hurting because you were yelling? (Emphasis added).

A Yes. (Emphasis added). (Vol. II, pp 53-54).

[Note: Complainant was not impeached, at trial, with the differences in yelling for help. Trial counsel used the testimony of Mr. Allen to point out that he heard no yelling during the alleged incident, while painting upstairs. (Vol, III, pp 93-94, 100, 103).]

13) Upon questioning at the preliminary examination, Complainant noted that she only had one bruise on her body, and it was on her arms, and this would show on the medical report. (PE, pp 38-39).

However, at Defendant's trial, Complainant noted that: "...I had bruises all over my chest." (Vol. II, p 41).

The statement that there were "bruises were all over my chest" was stated before Dr. McLean testified that she had performed "a complete physical examination" of Complainant. (Vol. II, p 115). The prosecutor asked her: "Now, when you were doing that head to toe physical examination, did you note any bruises or scrapings or abrasions?" She responded: "Yes, ma'am." (Vol. II, p 116). She noted that she found one "bruise" on the "left arm" of Complainant. (Vol. II, pp 116-117). This was the only bruise noted on Complainant's body, after a "head to toe" examination of Complainant.

[Note: Trial counsel impeached Complainant with the difference of her testimony at the preliminary examination and trial, at Defendant's trial. (Vol. II, pp 61-64). However, at closing argument defense counsel only noted the difference, on this subject, between Complainant and Dr. McLean. (Vol. III, p 97).]

- 32 -

The prosecution emphasized, once again, the unreliability of Defendant throughout his testimony, compared to Complainant's.

As it related to Defendant's credibility, the prosecution stated: "Let's talk about Charles Ingram and his 22 lies. Twenty - Two separate lies to police.", and shortly thereafter, "We are here because Charles Ingram told 22 lies instead of telling the truth. We are here because Charles Ingram would not come up with or could not come up with a better lie faster. These lies didn't work." (Vol. III, p 81). The prosecution also noted the number of, supposedly, lies Defendant was to have stated, a second time: "Twenty-two lies is what we're talking about here." (Vol. III, p 82).

The prosecution also gave, what she contended, how many different times Defendant had changed his story when giving his statement to a "detective." (Vol. III, pp 82-84). Following this, the prosecution gave what she believed was the reason why Defendant had stated the claimed lies: "Because if you can look over his 22 lies, if you can somehow swallow that pill, they you're going to have to evaluate her [Complainant's] credibility. (Vol. III, p 84).

Later, the prosecution claimed that Defendant had told more lies than she had uncovered: "He's a guy who tells lies. And we know this. I don't want to belabor it too much. I don't want to hit over and over again. You remember the 22 lies. There's probably more than that, because he told a whole bunch more." (Vol. III, p 88).

The prosecution then compared Complainant's reliability to Defendant's, and which to believe, when considering if Defendant was guilty or innocent: "You have to decide, do you believe Bobbie who told the same story from day one, or do you want to believe the defendant who said I didn't do that...." (Emphasis added). (Vol. III, p 88).

The prosecution, in her rebuttal argument, once again, emphasized how

important it was to believe Complainant over Defendant: "...Do you believe him? Because if you believe him, you gotta acquit him. That's how it works. If you believe Charles Ingram, you gotta return verdicts of not guilty." (Vol. III, p 105).

In her final summary, the prosecution emphasized that it was only the Defendant who lied, as opposed to Complainant:

> But, how can you believe Charles Imgram? Charles Ingram is the only person in this courtroom who has been caught red-handed lying. (Emphasis added). (Vol. III, pp 105-106).

The prosecution's final words were:

> ...He did it, he lied about it from the start, and you don't have to lie if you didn't do anything wrong. I thank you for your time and attention. I hope you return a verdict of guilty on all three counts. (Emphasis added). (Vol. III, p 106).

## WHY IT WAS IMPORTANT THAT DEFENSE COUNSEL IMPEACH COMPLAINANT DURING TRIAL WITH THE CITED DISCREPANCIES BETWEEN HER PREVIOUS TESTIMONY, AND ALSO POINT OUT THE DIFFERENCES AT CLOSING ARGUMENT

This case rises or falls on the testimony of Complainant, as opposed to Defendant's. The prosecution emphasized this at her closing argument, several times. She noted, near the beginning and end of her closing argument:

> ...You have to decide, do you believe Bobbie who told the same story from day one, or do you want to believe the defendant who said I didn't do that.... (Emphasis added). (Vol. III, p 88).

> ...And so now what we're left with is this, do you believe him? Do you believe him? Because if you believe him, you gotta acquit him. That's how it works. If you believe Charles Ingram, you gotta return verdicts of not guilty. (Emphasis added). (Vol. III, p 105).

> But, how can you believe Charles Ingram? Charles Ingram is the only person in this courtroom who has been caught red-handed lying. (Emphasis added). (Vol. III, pp 105-106).

> ...He did it, he lied about it from the start, and you don't have to lie if you didn't do anything wrong. I thank you for your time and attention. I hope you return a

verdict of guilty on all three counts. (Emphasis added).
(Vol. III, p 106).

Defense counsel also noted the importance of who to believe and, thus, implicated that this was, strictly, a credibility contest between Complainant and Defendant. (Vol. III, pp 101-102, 103).

The previous differences, stated in the facts section, that trial counsel did not confront Complainant with her different testimony at the preliminary examination, and at Defendant's trial, was extremely important, because both were under oath, and the jury should have heard her explanation of the differences. They also, should have been able to observe her reaction to the differences. After all, the court told the jury, when considering which witnesses to believe, amongst other guides:

> How did the witness look and act while testifying? Did the witness seem to be making an honest effort to tell the truth, or did the witness seem to evade the questions or argue with the lawyers? (Emphasis added). (Vol. III, p 111).

It is for the jury to determine the credibility of witnesses. People v Harrison, 283 Mich App 374, 377; 768 NW2d 98 (2009). To do this properly, it is necessary for the jury to see "How [   ] the witness look[ed] and act[ed] while testifying," when confronted with discrepancies in their testimony from one time to the next. So, it was very important for trial counsel to confront Complainant during the trial, instead of pointing out a few differences, at closing argument, via other witnesses' testimony. That being stated, most of the discrepancies, as cited in the facts section, was not raised during cross examination of Complainant, or during closing argument. (See each "Note" at end of each cited discrepancy cited in facts section.)

**THE INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD APPLIED TO DEFENDANT'S CLAIM, UNDER THIS ISSUE**

As noted in "ISSUE III", Michigan has adopted the standards outlined in

- 35 -

Strickland v Washington, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984) for determining what constitutes the ineffective assistance of counsel. People v Pickens, 446 Mich 298; 521 NW2d 797 (1994); People v Stanaway, 446 Mich 643, 687-688; 521 NW2d 557 (1994); People v Plummer, 229 Mich App 293, 307; 581 NW2d 753 (1998). Thus, Defendant will apply that standard to this issue also.

Defendant will, first, address his claim that his trial counsel was ineffective for not impeaching Complainant with her previous testimony, under oath, from the preliminary examination, at his trial.

In the facts section, Defendant has shown many examples where Complainant made statements at the preliminary examination, and then contradicted them at his trial. Defendant contends that they are important differences. Failure to present "admissible evidence that would have...emphasize[d] possible flaws in the state's case," and results in prejudice to the defendant, constitutes ineffective assistance of counsel. Matthews v Abramajtys, 319 F 3d 780, 789-790 (CA 6, 2003). In Tucker v Renico, 317 F Supp 2d 766 (E.D.Mich. 2004), the magistrate ruled that the petitioner, who was an appellant from the Michigan court system prior to going to that federal court, did not receive the affective assistance of trial counsel when counsel failed to present evidence that would have impeached the complainant in that case. This was so, even though some of the evidence was presented through avenues other than direct impeachment of the complainant.

In People v Winans, 187 Mich App 294, 300-301; 466 NW2d 731 (1991), the Court of Appeals noted that that trial counsel was ineffective where counsel proceeded to trial without adequately investigating what had occurred in a prior proceeding. The information in the previous proceeding was beneficial to the defendant at his trial, and that defendant was prejudiced. In Defendant's case, it is even worse. His counsel had the prior proceeding record, the

- 36 -

preliminary examination transcript, and failed to use it to impeach Complainant in important differences in her testimony, and it prejudiced Defendant.

These three cases apply to Defendant's situation, and Defendant requests the Court to consider them when making its ruling.

Defendant believes he fulfills the first Strickland standard, because he has shown that "the performance of counsel was below and objective standard of reasonableness under prevailing professional norms". Plummer, supra at 229 Mich App 307. See Strickland, supra at 466 US 688; 104 S Ct 2065, and Stanaway, supra at 446 Mich 687. This fulfills the first Strickland requirement that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment". Strickland, supra at 466 US 687; 104 S Ct 2064. A reasonable counsel, under prevailing professional norms, would have recognized the value of bringing, to the attention of Complainant, the discrepancies between her preliminary examination testimony, and trial, and let the jury see her reactions to them. After all, the Court emphasized to the jury that a witness' reaction, and actions, when testifying, can be an indication of truthfulness.

Further, a reasonable counsel would have not only impeached Complainant with the cited discrepancies but would have, after doing so, presented them at closing argument, and pointed out how they affected her credibility in this "She said", "He said", contest.

Defendant does concede that one of the most important discrepancies was brought to the jury's attention at closing argument -- that being her claim that she screamed for help at the time of the alleged assault. At trial, Complainant testified that she yelled for help, at least six times. (Vol. II, pp 53-54). However, at Defendant's preliminary examination she stated, at

least five times, that anything she stated to Defendant to stop, was not loud enough for Mr. Allen to hear, upstairs. (PE, pp 37-38). The jury was never given an opportunity to hear, and see her reactions, to the discrepancies during trial. Counsel simply pointed out that Mr. Allen, who was painting upstairs, testified that he heard no screaming. (Vol. III, pp 93-94, 100, 103). The prosecution simply negated Mr. Allen's testimony by noting that he was a long time friend of Defendant, and he got paid for working for Defendant. (Vol. III, p 86). This attack on Mr. Allen's credibility would have made no difference if defense counsel would have impeached Complainant during the trial with the differences between her preliminary examination and trial testimony. In fact, it would have bolstered his testimony, which was crucial to Defendant.

Defendant points out the same claim for paragraphs "9" and "13", previously stated, where counsel failured to directly impeach Complainant with her preliminary examination testimony directly, at his trial, but chose to use other less impactful testimony to impeach her.

Also, even if defense counsel, in a few instances, used other testimony at closing argument to attack the credibility of Complainant, it would have certainly enhanced that attack if counsel used the differences in the preliminary examination, coupled with those. A reasonable counsel would have used this tactic. There was no down side to doing so.

At this juncture, Defendant points out, once again, as noted by both the prosecution, and defense counsels, the conviction rests, mainly, on who the jury believed -- Complainant or Defendant. Defendant, in the facts section, has shown numerous conflicts between what Complainant testified at Defendant's preliminary examination and his trial. Defendant would ask the Court to review the facts section for those instances.

As to the second standard, that Defendant was "prejudiced" to the point that he was denied a fair trial, the following supports that. Strickland, supra at 466 US 687; 104 S Ct 2064.

As pointed out several times, the prosecution, and defense counsel, made it clear, at closing arguments, that this case revolved on who the jury believed, solely -- Complainant or Defendant. (Vol. III, pp 88, 101-102, 103, 105-106). Defendant has cited many instances that defense counsel could have shown that Complainant's testimony at trial was not reliable, via her preliminary examination testimony. Also, if this was presented along with any other attacks that counsel made at closing argument to Complainant's truthfulness, by using other witness, it would have been supported, in many instances, by Complainant's own words from the preliminary examination. It could not get any better than that.

Defendant was prejudiced by trial counsel's failure to impeach Complainant at his trial, and pointing it out at her closing argument, to the extent that it denied him a fair trial. Strickland, supra at 466 US 687; 104 S Ct 2064. Another way of saying this is that "prejudice" is shown where "a reasonable probability exists that, in the absence of counsel's unprofessional errors, the outcome of the proceedings would have been different." Plummer, supra at 229 Mich App 307. As noted in "ISSUE II", a "reasonable probability" is not "an absolute certainty", nor is it as high as the "preponderance of the evidence" standard. Magana v Hofbauer, 263 F 3d 542, 550 (CA 6, 2001), citing Williams v Taylor, 529 US 362; 120 S Ct 1495; 146 L Ed 2d 389 (2000).

The examples Defendant has shown, in the facts section, show several important contradictions that could have been used to impeach Complainant by her testimony at Defendant's preliminary examination. The prejudice becomes very clear, for trial counsel not pointing these out to the jury, when one

looks at the prosecution's claim that Complainant told her story many times, and one of them was "on a stand in August of 2008" (Defendant's preliminary examination). (Vol. III, p 78). Because trial counsel did not point out that Complainant did not tell the same story at Defendant's preliminary examination that she did at his trial, in key areas, it permitted the jury to believe that Complainant had to be truthful in her trial testimony because she testified, under oath, in "2008". The prosecution further emphasized this. She stated:

> So we [defense counsel] try to do what a good defense attorney should do, he tried to find places in the preliminary exam transcript where maybe it wasn't quite exactly the same. Virtually the same, but maybe not exactly the same words. Or maybe just it got turned around a little bit. And in all those scourings we found one word. One word. And that one word is, the question was, do you remember the question, the question was, did you have scarring or bruising? To which Bobbie said no. And you saw how these court hearings happen. Questions are asked, answers are given, and they're happening on top of each other, right? So maybe when Bobbie said no, she was talking about the scarring, which she didn't have, okay?...That was the extent of what could be found to look at Bobbie Johnson after three and a half years, to look at what Bobbie Johnson told you what happened and to find fault with it. That one point in a prelim transcript she said were there scars or bruising, no. Was there bruising, yes. Okay. And I would submit to you, first, there's nothing else, not one thing that they found that changed about her testimony. (Emphasis added). (Vol. III, pp 79-80).

It is clear from the above quotations from the prosecution's closing argument that she relied heavily on the claim that defense counsel could only find one minor error in what Complainant testified at the preliminary examination, as opposed to at trial, to bolster Complainant's credibility. This is especially important when this case comes down to a credibility contest between Complainant and Defendant.

It cannot be said that defense counsel's failure to impeach Complainant with her preliminary examination testimony was "sound trial strategy". Our Michigan Supreme Court describes what constitutes "A sound trial strategy",

and what Defendant's trial counsel failed to do, is not it. The Court stated, in People v Grant, 470 Mich 477, 486-487; 684 NW2d 686 (2004):

> A sound trial strategy is one that is developed in concert with an investigation that is adequately supported by reasonable professional judgments. Counsel must make "an independent examination of the facts, circumstances, pleadings and laws involved. (Citations omitted).

Defendant's counsel failed to examine, adequately, Defendant's preliminary examination transcript, and use them to impeach Complainant. This was not "sound" trial strategy.

CONCLUSION

As previously pointed out, state and federal courts have ruled that failure to obtain and use transcripts, or documents, of a previous proceeding to impeach a key witness, and it prejudiced the defendant, constitutes ineffective assistance of counsel. Blackburn v Foltz, supra; Winans, supra. Defendant's counsel had the preliminary examination transcript, but failed to use it to the benefit of Defendant, by impeaching the prosecution's key witness. This was even more egregious.

There was a "reasonable probability" that if trial counsel would have impeached Complainant with the preliminary examination transcript, adequately, he would not have been found guilty.

For the preceding reasons, Defendant requests the Court to vacate his convictions, and grant him a new trial.

REQUEST FOR EVIDENTIARY HEARING

Defendant is requesting the Court to grant him an evidentiary hearing to determine what was trial counsel's strategy for not using the preliminary examination transcript to impeach Complainant, if it does not grant him his requested relief. Plummer, supra at 229 Mich App 308, citing People v Ginther, 390 Mich 436, 443; 212 NW2d 922 (1973).

- 41 -

## ISSUE V

DEFENDANT DID NOT RECEIVE THE EFFECTIVE ASSISTANCE OF
TRIAL COUNSEL WHEN COUNSEL FAILED TO DO A PROPER
INVESTIGATION AND PRESENT FACTS CONTAINED IN DOCUMENTS
THAT NEGATED COMPLAINANT'S VERSION OF EVENTS, AND
THEREFORE, SHE SHOULD NOT HAVE BEEN BELIEVED.


**PERTINENT FACTS THAT SUPPORT DEFENDANT'S CLAIM THAT TRIAL COUNSEL WAS
INEFFECTIVE FOR FAILING TO PERFORM AN ADEQUATE INVESTIGATION AND PRESENT
AVAILABLE INFORMATION THAT SUPPORTED HIS CASE, OR NEGATED THE PROSECUTION'SS**

As pointed out in "ISSUE III", the prosecution placed great emphasis on

its claim that Complainant was consistent in her story, as what occurred

between her and Complainant. At her closing argument, she stated:

> Let's talk about Bobbie [Complainant]. Bobbie has told
> her story multiple times, and you have heard that through
> this trial. She told her story multiple times. She told it
> to her stepmom. She told it to the ER. She told it to the
> detective. She told it on a stand in August of 2008
> [Defendant's preliminary examination], and she told it
> again on the stand here, (Emphasis added). (Vol. III, p
> 78).

> ...You have to decide, do you believe Bobbie who told the
> same story from day one. or do you want to believe the
> defendant who said I didn't do that.... (Emphasis added).
> (Vol. III, p 88).

> But, how can you believe Charles Ingram? Charles
> Ingram is the only person in this courtroom who has been
> caught red-handed lying. (Emphasis added). (Vol. III, pp
> 105-106).

The following documents, if presented at Defendant's trial would have

negated the emphasis on her claim that Complainant was consistent, as to what

occurred, from the beginning of the day of the claimed assault through

Defendant's trial.

In a police report generated by "Officer Richard Lutz, page 3, exhibit

"A", dated the day after the claimed assault, he noted:

> The complainant stated the suspect followed her outside
> and threatened her not to tell. The complainant stated the

suspect told her "you will be alright as long as you don't tell anybody". (Emphasis added). (Exhibit "A").

According to Detective Mike Fink, he met with Complainant on July 16th, five days after Officer Lutz. Detective Fink, apparently taped the interview, and a transcript of the interview was generated. Page 16 of that reveals the following. (Note: "Q:" represents questions by "Detective Fink", and "A:" represents the answers by "Bobbie Johnson"). (The following is revealed:

Q: Okay, did Charles ever tell you not to say anything or?

A: No

Q: So Charles never told you, "Don't say anything?

A: He just said ... he said, "You going to be all right." Them was his last words and I never talked to him afterwards. (Exhibit "B", p 16 of 23).

At Defendant's trial, Complainant testified that after the alleged assault, she immediately went to the car Vercie Cooper was driving, told her what occurred, and they went to her home. There was nothing about Defendant threatening her. (Vol. II, pp 43-44, 55-56, 57).

Officer Lutz was not called by the prosecution, or defense, to testify, and Detective Fink was never questioned about the preceding in his report.

In a typed written report by "Detective Timothy Fink", he noted: "On 7/16/08, 1407 hrs, I conducted a recorded interview of Bobbie Johnson at SPD. See transcript of recording." (Exhibit "C", page 3 of 8). The report goes on to state:

She stated that the suspect grabbed her arms and began sucking on her neck. She stated that he pulled her shirt and bra up. He then began to fondle and suck her breasts. (Emphasis added). (Exhibit "C", page 3 of 8).

Complainant was questioned about this in the taped interviewed and the transcription of the tape reveals:

Q: How was he holding you fact to face or is he?

- 43 -

A: Yeah, we were face to face. He was sucking on my neck and then he starts ... He took ... first of all ... first he pulled my shirt up and I just kept trying to pull my shirt down cause I didn't want him touching me and he just grabbed my arms and started sucking on my breast and. (Emphasis added).

Q: Okay. what he pulled the shirt up you said?

A: Yes, he pulled my shirt and started.

Q: Were you wearing a bra?

A: Yes

Q: Okay, did he pull that up too or?

A: Uh uh, he started sucking on my breast.... (Emphasis added). (Exhibit "D", page 14 of 23).

There was no mention of Complainant's claim that Defendant sucked her breast, at the preliminary examination, or Defendant's trial. At the preliminary examination and trial, Complainant testified that Defendant only touched her with his hand. (PE, pp 17-18). (Vol. II, pp 41-42).

In the transcript of her interview with Detective Fink, the following occurred, as to how she got to the house where the alleged assault occurred.

Q: You walked there or did you drive?

A: No, my friend dropped me off.

Q: Okay, who is your friend that dropped you off?

A: Uh, her name is [Redacted].

         *                    *                    *

Q: All right, so she dropped you off right after school?

A: Ah ha (Exhibit "E", page 5 of 23).

At the trial Dr. Michelle McLean testified that Complainant told her that the person that had assaulted her had also taken her to the house where the alleged assault occurred. (Vol. II, p 115).

- 44 -

As pointed out in "ISSUE III", pages 20-21, it was noted that at the preliminary examination, she testified that she did not yell loud enough for Mr. Allen, the painter, who was upstairs during the alleged assault, to hear her telling Defendant to stop. (PE, pp 37-38). However, at Defendant's trial, she testified that she was "yelling" very loud, to the point: "I mean, I'm yelling in the basement, no, stop." She also noted that she was yelling so loud her throat started hurting. (Vol. II, pp 53-54). (See pages 21-22 of this brief for complete testimony).

The transcript of Complainant's statement states:

Q: Did you scream or anything?

A: Pretty much I mean my voice was hoarse that day, so I really couldn't scream aloud but I was ... I got a high voice so I was like, "Stop, stop ... no, no...." (Exhibit "F", page 15 of 23).

Next, Defendant points out that Complainant testified that after the alleged assault, she immediately left the house with Vercie Cooper, got into her car, and they left, immediately. (Vol. II, pp 43, 55-56, 57). However, as pointed out in "ISSUE II", she noted, at the preliminary examination, that when she left the house, she went to talk to some people who had a "HIV" certificate for her, and that she went and got it from them. (PE, pp 23-25). The transcript of Complainant's statement supports what she testified at the preliminary examination, as opposed to what she stated at Defendant's trial.

...And after I got my test results from the H.I.V. people I sat in the car.... (Exhibit "F", page 15 of 23).

Another discrepancy that could have been pointed out, is the following:

Q: Okay, and he called you and then uh Charles called you back in the house?

A: Yeah, he called me back in the house and my dad was there now and uh he was like, "Uh, you can come here tomorrow and help uh sand the floors." I was like, "No." He was like, "You going to come back?" I said, "No, I'll think about it. I have stuff to do tomorrow."

- 45 -

He got in the car and left. (Exhibit "B", page 16 of 23).

At Defendant's trial, Complainant was asked if she ever went back into the house after the alleged assault, and she was emphatic that she never went back in. The transcript notes:

Q Did you ever go back in the house?

A No. For what? (Emphasis added).

Q I'm just asking. Did you ever go back on the front or back porch?

A No.

Q So you stayed in the car and then you drove to your house?

A Yes. (Vol. II, p 57).

Another discrepancy that could have been pointed out was when Complainant told Detective Fink that the first time she ever told any one that she was assaulted was after she got home. She stated:

Q: Okay, now when did you tell somebody?

A: Um, she [Vercie Cooper] asked me like later on that day cause I really didn't want to tell nobody like ... well it had to be around like 10 something or the next morning probably. It was ... yeah it had to be around 10 something.... (Emphasis added). (Exhibit "B", page 16 of 23).

At Defendant's trial, Complainant testified that she told Vercie Cooper as soon as she got in her car that Defendant had assaulted her. (Vol. II, pp 43, 55-56).

Also, in her statement to Detective Fink, she accused Mr. Allen, the painter who was upstairs during the alleged assault in the basement, was "flirtatious" with her. She stated:

Q: All right, did uh ... did the guy who was painting did he seem like he knew what was going on at all or could you tell?

A: I mean he was a little flirtatious too being old cause
he was like ... what did he say? I was like teasing
him. I was like, "Uh huh I paint better than you."
(Emphasis added).

Q: Um hmm

A: He was like, "You look better than me so." (Emphasis
added).

Q: Yeah

A: ... you might just pain better than me." (Exhibit "G",
page 20 of 23).

When Detective Fink interviewed Jamie Allen, the painter, he broached the
subject of flirting from the point of he flirting with Complainant, however.
The transcribed statement shows:

Q: Did she ever flirt with you or anything?

A: No, no, no ... uh, uh ... no.

Q: Did she ever come on  to you?

A: No, no, no, no, no, no

Q: Did she ever rub her body against you?

A: No, no, no, no, no, no

Q: I mean I'm not saying you did anything wrong.

A: No, no, no, no ... no, she didn't.

Q: Did she ever rub her breast against you or her butt
against you?

A: No, no, no, no ... she just tripping, bumped into me
and that was it. (Emphasis added).

Q: Okay

A: But he was standing right there too.

Q: But she didn't do anything to make you think she was
flirting with you or wanted to try to entice you or
nothing? (Emphasis added).

A: Oh no, no, no, no uh, ... no, no, no ... uh, uh ... no,
uh, uh (Exhibit "H", pages 11-12 of 18).

- 47 -

There was a report that had Defendant's police case number -- "08 - 5843", pertaining to a person by the name of "John Moten". It notes:

> His security guard fired for activity with Bobbie Johnson. John had to <u>speak with Bobbie about stalking sec. officer.</u> (Emphasis added). (Exhibit "I").

Also, enclosed is a copy of the report of the semen that was tested on Complainant, and compared with Defendant's DNA. The report notes:

> The DNA types obtained from item BP08-3559-2A-S (sperm fraction from back of underwear) indicate that <u>more than one donor is associated with this sample.</u> (Emphasis added). (Exhibit "J").

The information could have been brought out, via Detective Fink, being the officer in charge, and in such a fashion that did not violate the "Rape Shield Act". It would support Defendant's claim that he had sex previously with Complainant, and that the sex with her was consensual. Exhibits "H", and "I" would show that she did not have an aversion to being involved with older men.

Lastly, another discrepancy becomes apparent where Complainant told Detective Fink what occurred with the painter, Mr. Allen, after the alleged assault:

> Q: Okay, you don't have any idea whether he [Jamie Allen] knew what was going on in the basement at all?
>
> A: No
>
> Q: Nothing like that? Okay, when you walked out of the house was he still in the house?
>
> Q: Yeah
>
> A: Yeah, he was in the house and when my daddy got there everybody sat on ... everybody sat on the porch so the <u>painter was standing above me.</u> Charles was <u>sitting right like next to me.</u> (Emphasis added).
>
> Q: Yeah
>
> A: Yeah, <u>he was sitting next to me.</u> My dad was right her and Vercie was right here so <u>everybody was in a little circle.</u> (Emphasis added). (Exhibit "G", page 20 of 23).

Complainant testified, at Defendant's trial, that she immediately, after the alleged assault, went with Vercie Cooper, to her car, told her what had occurred, and left for home. (Vol. II, pp 43, 55-56, 57).

**THE INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD APPLIED TO THE ISSUE OF COUNSEL FAILING TO USE AVAILABLE DOCUMENTS TO SUPPORT DEFENDANT'S CASE, AND NEGATE THE PROSECUTION'S**

Defendant, as in his other ineffective assistance of counsel claims, applies the standards outlined in Strickland v Washington, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). People v Pickens, 446 Mich 298, 302-303; 521 NW2d 797 (1994); People v Stanaway, 446 Mich 643, 687-688; 521 NW2d 557 (1994). The two prong standard that must be met to show that Defendant did not receive the effective assistance of counsel is that "(1) the performance of counsel was below an objective standard of reasonableness under prevailing professional norms and (2) a reasonable probability exists that, in the absence of counsel's unprofessional errors, the outcome of the proceedings would have been different." People v Plummer, 229 Mich App 293, 307; 581 NW2d 753 (1998).

Defendant has shown that there was a great deal of information available to negate the prosecution's claim because Complainant was truthful in all her statements to various people, and at Defendant's preliminary examination and trial. Exhibit's "A" - "I" shows that Complainant did not tell the same story.

In People v Dixon, 263 Mich App 393; 688 NW2d 308 (2004), that court ruled that that trial counsel was ineffective for not obtaining information and presenting it at trial. In Defendant's case, his trial counsel also failed to present information that was available. See also, Tucker v Renico, 317 F Supp 2d 766 (E.D.Mich. 2004); Tucker v Prelesnik, 181 F 3d 747 (CA 6, 1999). This is what occurred in Defendant's case.

Defendant believes that he has fulfilled the first standard necessary to

show that he did not receive the effective assistance of counsel. A reasonable counsel would have used the information contained in the enclosed exhibits to attack the credibility of Complainant, because most of the prosecution's case rested upon her testimony, and the remainder of the witnesses were used to try to verify, and support, that testimony. Strickland, supra a 466 US 688; 104 S Ct 2065; Stanaway, supra at 446 Mich 687; Plummer, supra at 229 Mich App 307.

Defendant also believes that he fulfills the second standard necessary to show that his trial counsel was ineffective -- prejudice. The information contained in exhibits "A" - "I" negates most of the prosecution's claim that Complainant told the same story to the police, "ER" staff, at the preliminary examination, and Defendant's trial. The information is especially powerful when coupled with "ISSUE IIII", where that cited information presented there also negated the prosecution's claim that Complainant told the same story at all stages of her contact with people before, and during all judicial proceedings. This constitutes prejudice. Strickland, supra at 466 US 687; 104 S Ct 2064; Stanaway, supra at 446 Mich 687-688; Plummer, supra at 229 Mich App 307. With the other information cited in "ISSUE III", there was a "reasonable probability" that the outcome of his trial would have been different, that he would have been found not guilty, in this credibility contest between Complainant and Defendant. Stanaway, supra at 446 Mich 687-688; Strickland, supra at 466 US 687; 104 S Ct 2064. A "reasonable probability" is not a certainty, or is it as high as the preponderance of evidence standard. Magana v Hofbauer, 263 F 3d 542, 550 (CA 6, 2001), citing Williams v Taylor, 529 US 362; 120 S Ct 1495; 146 L Ed 2d 389 (2000).

Defendant contends that he has fulfilled both standards necessary to receive a new trial.

CONCLUSION

- 50 -

Defendant is aware that a trial counsel is given great latitude when it comes to trial strategy. However, he points out that any trial strategy must be "sound". Plummer, supra at 229 Mich App 307; Strickland, supra at 466 US 689; 104 S Ct 2065. This concept is spelled out in People v Grant, 470 Mich 477, 486-487; 684 NW2d 686 (2004), where our Supreme Court stated:

> A sound trial strategy is one that is developed in concert with an investigation that is adequately supported by reasonable professional judgments. Counsel must make "an independent examination of the facts, circumstances, pleadings and law involved...." VonMoltke v Gillies, 332 US 708, 721; 68 S Ct 316; 92 L Ed 309 (1948); Blackburn v Foltz, 828 F 2d 1177, 1183 (CA 6, 1987). (Emphasis added).

As outlined in Grant, his trial counsel did not use a "sound" trial strategy when choosing not to impeach Complainant with exhibits "A" - "J".

For the preceding reasons, Defendant believes that he was denied the effective assistance of trial counsel under the Sixth Amendment, and he requests the Court to vacate his convictions, and grant him a new trial.

## REQUEST FOR EVIDENTIARY HEARING

If the Court does not grant Defendant relief on this issue, he is requesting an evidentiary hearing to determine why his trial counsel failed to use the information contained in exhibits "A" - "I", at his trial. Plummer, supra at 229 Mich App 308, citing People v Ginther, 390 Mich 436; 212 NW2d 922 (1973).

## ISSUE VI

**THE TRIAL COURT IMPROPERLY SCORED THE OFFENSE VARIABLE 13 AND PRIOR RECORD VARIABLE 7 MAKING THE GUIDELINES INCORRECT. IN VIOLATION OF DEFENDANTS SIXTH AND FOURTEENTH AMENDMENT RIGHTS.**

777.41(2)(C). The one penetration on which a first or third-degree criminal sexual conduct offense is based must not be counted for purposes of scoring OV 11 MCL-777.41(2)(c). Appeal Longe Range sentencing up word departure from appropriate sentence range, the court must state on the record the reason for departure. MCL 769.34(3) used PRV:7 20 two or more subsequent or concurrent felony. OV-11: 50 points when there is two or more criminal sexual penetration on which a first or third-degree sexual conduct offense is based must not be counted for OV-11 purposes of scoring 777.41(2)(c). OV-13: continuing pattern of criminal behavior/ N/A MCL 777.43(1)(g). OV-19: offender used force of the threat against another person MCL 777.49(c) but it should be 0 Mich 777.49(d).

Elements of offense MCL 750.520 E(1)(A) 4th

    1. A person is guilty of criminal sexual conduct in the fourth degree if he or she engages in sexual conduct with another person and if any of the folling circumstances exist:

    (A) That other person is at least 13 years of age but less than 16 years of age, and the actor is 5 or more years older than the other person.

MCL 750.520 D(1)(B) 3Rd.

    (1) A person is guilty of criminal sexual conduct in the third degree is the person engages in sexual penetration with another person and if any of the

- 52 -

following circumstances exit:

(B) Force or coercion is used to accomplish the sexual penetration. Force or coercion includes but is not limited to any of the circumstance listed in section 750.520b(1)(f)(i) to (v).

## ARGUMENT

A sentencing court has discretion to determine the points assessed to each score **People v. Hornsby**, 251 Mich App 452, 468 (2002). According to **People v. leversee**, 243 Mich 337; 622 NW2d 325 (2000) the court must provide the evidence of record to adequately support a particular score Under Michigan's sentencing guidelines act, a court must imposed a sentence within the appropriate sentencing range **People v. Hegwood**, 465 Mich 432, 438 39; 636 NW2d 127 (2001). A challenge to the scoring may be raised at sentencing, in a motion. Any determination that the appropriate guideline range was lower than the range relied upon at sentencing entitles the defendant to a resentencing **People v. Francisco**, 474 Mich 82, 90; 711 NW2d 44 (2006) and **People v. Johnson**, 474 Mich 96; 712 NW2d 703 (2003). Resentencing is required when an error changes the guidelines range 474 Mich at 96. Even if the original sentence is within the corrected guidelines range **People v. Gardner**, 482 Mich 41 (2008).

Furthermore a defendant has a constitutional right to be sentenced based on accurate information US Const Am XIV; Const 1963 Art 1 § 27: **Townsend v. Burke**, 334 US 736; 68 S Ct 1252; 92 LEd2d 1690 (1948).

This issue is based on the success of the DOUBLE JEOPARDY

- 53 -

claim in issue II. If defendant is successful then the three counts would read as one count and alter all of the challenged guidelines as PRV 7 and OV 13. The new guidelines would reflect as cell A/VI and the range would be 36 to 60 months on the minimum sentence which is lower then time imposed as to the current 7 years for 3rd degree.

Wherefore defendant moves this court to correct the invalid score and remand back for resentencing to the correct guidelines of PRV at 0 points and OV's at 85 points.

Right to have compulsory process for obtaining witnesses in his favor because the state arbitrarily denied him the right to put on the stand.

Petitioner convictions should be vacated and he should be granted a new trial because he was subjected to multiple prosecutions violating the double jeopardy standards of his Fifth Amendment right to the United States Constitution.

## ISSUE VII

DEFENDANT DID NOT RECEIVE THE EFFECTIVE ASSISTANCE OF APPELLATE COUNSEL WHEN COUNSEL DID NOT RAISE THE ISSUES HE NOW RAISES, ON DEFENDANT'S APPEAL OF RIGHT, AND THUS, HE FULFILLS THE "CAUSE" REQUIREMENT OF MCR 6.508(D)(3)(a).

**PERTINENT FACTS THAT SUPPORT THE CLAIM THAT HIS COUNSEL DID NOT RAISE HIS ISSUES ON HIS APPEAL OF RIGHT**

On Defendant's appeal of right, his appellate counsel raised three issues, for which the Court of Appeals, and the Michigan Supreme Court ruled that they had no merit.

Defendant is raising five issues, in this Motion For Relief From Judgment that are supported by the record, authority, and exhibits, were not raised by his appellate counsel, on his appeal of right.

**THE INEFFECTIVE ASSISTANCE OF COUNSEL STANDARD APPLIED TO DEFENDANT'S CLAIM THAT HE DID NOT RECEIVE THE EFFECTIVE ASSISTANCE OF COUNSEL ON HIS APPEAL OF RIGHT**

Michigan and federal courts has adopted, and applies, the standard for determining ineffective of assistance of appellate counsel, as cited in Strickland v Washington, 466 US 668; 104 S Ct 2052; 80 L Ed 2d 674 (1984). People v Kenneth Johnson, 144 Mich App 125, 130-131; 373 NW2d 263 (1985); People v Reed, 449 Mich 375; 535 NW2d 496 (1995); Evitts v Lucey, 469 USA 387; 105 S Ct 830; 83 L Ed 2d 821 (1985); Morse v Trippett, 102 F Supp 2d 392 (E.D.Mich. 2000).

Defendant is aware that an appellate counsel need not raise all nonfrivolous issues on a defendant's appeal or right, or direct appeal. Reed, supra at 449 Mich 391, citing Jones v Barnes, 463 US 745, 752; 103 S Ct 3308, 3312; 77 L Ed 2d 987 (1983). However, appellate counsel is still required to raise issues that would entitle a defendant to some type of relief. People v Smith, 158 Mich App 220; 405 NW2d 156 (1987); Carpenter v Mohr, 163 F 3d 938

- 55 -

(CA 6, 1998); Morse v Trippett, 102 F Supp 2d 392 (E.D.Mich. 2000); Coddington v Langley, 202 F Supp 2d 687 (E.D.Mich. 2002); Carver v Straub, 349 F 3d 340 (CA 6, 2003); Williams v Taylor, 529 US 362;120 S Ct 1495; 146 L Ed 2d 389 (2000).

In Defendant's issues "I" - "III", he has shown that they are supported by the record, a great deal of authority, and in certain issues, exhibits. A reasonable appellate counsel would have recognized these issues and raised them on Defendant's appeal of right. In short, appellate counsel did not do a reasonable investigation before deciding what issues to raise. Strickland, supra at 466 US 688; 104 S Ct 2065. Appellate "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland, supra at 466 US 687; 104 S Ct 2064. Thus, Defendant fulfills the first Strickland standard.

Defendant also fulfills the second Strickland standard, because appellate counsel's failure to raise his previous herein cited issues, on his appeal of right, prejudiced him. If appellate counsel had raised his issues on his appeal of right, there was a "reasonable probability" that the Court of Appeals would have granted Defendant some type of relief. This fulfills the second Strickland requirement. Strickland, supra at 466 US 687, 694; 104 S Ct 2064, 2068. As noted in his previous ineffective assistance of counsel issues, a "reasonable probability" is not a certainty, nor is it as high as the preponderance of evidence standard. Magana v Hofbauer, 263 F 3d 542, 550 (CA 6, 2001), citing Williams v Taylor, 529 US 362; 120 S Ct 1495; 146 L Ed 2d 389 (2000).

In People v Smith, 158 Mich App 220; 405 NW2d 156 (1987), the Court of Appeals noted that that appellate counsel was ineffective because he failed to raise several issues on that defendant's appeal of right. The issues that

justified relief, were those that defendant raised in a collateral appeal, as
Defendant is now doing. That Court at 233, citing Strickland, stated:

> ...Defendant's prior appeal, raising only two issues,
> stands in stark contrast to this appeal raising forty
> issues, many of which we have found meritorious. That we
> are taking the extraordinary step of reversing defendant's
> convictions more than eight years after it was affirmed by
> another panel of this Court indicates that defendant was
> also denied effective assistance of appellate counsel.
> Evitts v Lucey, 469 US 387; 105 S Ct 830; 83 L Ed 2d 821
> (1985); People v Kenneth Johnson, 144 Mich App 125; 373
> NW2d 263 (1985). (Emphasis added).

In Defendant's case, it is not a consideration as to how many issues
appellate counsel raised compared to the ones he now raises, but the fact that
Defendant's issues are "meritorious", while appellate counsel's issues were
not. In Coddington v Langley, 202 F Supp 2d 687 (E.D.Mich. 2002), that court
recognized that the petitioner's appellate counsel was ineffective for not
raising three meritorious issues in the Michigan Court of Appeals, while
raising other which were meritless, as what occurred in Defendant's case. See
also, Morse v Trippett, 102 F Supp 2d 392 (E.D.Mich. 2000).

In the federal Sixth Circuit Court of Appeals, that court noted several
circumstances which constitute the ineffective assistance of appellate
counsel, which apply to Defendant's appellate counsel. Carpenter v Mohr, 163 F
3d 938, 947 (CA 6, 1998).

The first case cited in Mohr is Reed v Ross, 468 US 1, 13-14; 104 S Ct
2901; 82 L Ed 2d 1 (1984) ("noting that although tactical decisions do not
make out a claim of ineffective assistance, the failure to raise a significant
constitutional claim may"). Defendant's claims are all "constitutional" and
there can be no "sound" tactical strategy in not raising the enclosed issues
on Defendant's direct appeal. People v Grant, 470 Mich 477, 486-487; 684 NW2d
686 (2004).

The next case cited in Mohr is Clemmons v Delo, 124 F 3d 944, 953-954 (CA

8, 1997) ("finding ineffective assistance of appellate counsel where appellate counsel failed to raise obvious claim on direct appeal"). All of Defendant's issues are "obvious claim[s]", given the facts, authority, and enclosed exhibits, supporting them. Appellate counsel should have done a thorough investigation and raised them.

The third case, in Mohr, is Banks v Reynolds, 54 F 3d 1508, 1515 (CA 10, 1995) ("failure to raise a 'dead bang winner' claim on appeal was constitutionally ineffective assistance of appellate counsel even though other strong claims were raised"). Defendant's claims herein raised are "dead bang winner[s]". They are supported by many facts, authority, exhibits, and the record. A "dead bang winner" is "an issue which was obvious from the trial record." Coddington v Langley, supra at 202 F Supp 2d 698. As a note, Defendant, by applying this claim to his situation, is not acknowledging that the issues raised by his appellate counsel, on his appeal of right, were "strong". They were not.

The next three cases cited in Mohr is Mayo v Henderson, 13 F 3d 528, 533 (CA 2, 1994); Fagan v Washington, 942 F 2d 1155, 1157 (CA 7, 1991), and Matire v Wainwright, 811 F 2d 1430, 1438 (CA 11, 1987), note that it is either ineffective assistance of appellate counsel where counsel "ignored significant obvious issue[s] while pursuing weaker claims," or where appellate counsel "failed to raise substantial claim but instead raised weaker one." This is what occurred in Defendant's case, when comparing the issues appellate counsel raised, and what Defendant now raises.

## CONCLUSION

Defendant contends that he has not received the required effective assistance of appellate, per the Strickland standard. The preceding having established this, he fulfills the "cause" requirements of MCR 6.508(D)(3)(a).

People v Hardaway, 459 Mich 876; 585 NW2d 303 (1998); People v Mosly, 259 Mich App 90, 94-97; 672 NW2d 897 (2003). He also, because of the merits of his issues, fulfills the requirement of MCR 6.508(D)(3)(b), because each issue herein raised shows how Defendant was prejudiced. Mosly, supra at 259 Mich App 94-97.

Lastly, even if the Court does not believe that Defendant fulfills 6.508(D)(3)(a) and (b), the Court should grant him relief pursuant to 6.508(D)(3)(b)(iii). Mosly, supra at 259 Mich App 95.

For the preceding reasons, Defendant requests the Court to rule that he did not receive the effective assistance of appellate counsel, that he fulfills the requirements of MCR 6.508(D)(3), and grant him his requested relief stated in his enclosed motion.

## REQUEST FOR EVIDENTIARY HEARING

If the Court does believe that it can ascertain, from the record, why appellate counsel did not raise the issues Defendant herein raises, he is requesting an evidentiary hearing to ascertain this. Plummer, supra at 229 Mich App 308, citing People v Ginther, 390 Mich 436, 443; 212 NW2d 922 (1973).

### RELIEF REQUESTED

For these reasons, Petitioner CHARLES DEXTER INGRAM, asks that this Court GRANT the petition for writ of habeas corpus.

Respectfully
PETITIONER, In Pro Per

*Charles Ingram*

CHARLES DEXTER INGRAM 825646
Cooper Correctional Facility
3100 Cooper Street
Jackson, Michigan 49201

January 31 , 2017

- 59 -

EXHIBIT "A"

| | | |
|---|---|---|
| ..AW POLICE DEPARTMENT CRIME REPORT | Report Date/Time: **7/11/2008 4:48:59 AM** | Case No.  0871705843 Report No. 0871705843.1 Case Status  ACTIVE |

The complainant stated he released her when her dad's girlfriend (Vercie Cooper) showed up at the house. The complainant stated the suspect followed her outside and threatened her not to tell. The complainant stated the suspect told her " you will be alright as long as you don't tell anybody". The complainant stated the only she told yesterday was Cooper. The complainant stated the suspect spent the whole evening at the complainant's house so that she would not have a free minute to tell her father. The complainant stated she told her father today and he sent her to Covenant.

The complainant stated she washed herself yesterday, the hospital still performed the rape kit.

WITNESS STATEMENT: (Vercie Annette)
Cooper stated she came to the venue looking for the complainant and the complainant's father. Cooper stated she went in the house and was calling their names. Cooper stated she was near the basement steps yelling and the complainant finally stormed up the steps from the basement. Cooper stated the complainant looked very upset and went directly outside. Cooper stated she seen the suspect outside talking to the complainant. Cooper stated the complainant was upset the whole ride home from Reed St. Cooper stated the complainant went right upstairs when they got home, changed her clothes and washed up. Cooper stated she asked the complainant if something happened over at the venue and she said "yes". Cooper stated she asked the complainant if she was raped and the complainant stated "yes". Cooper stated the complainant asked her not to say anything and she respected her wishes.

PROPERTY:
See property page

**CASE STATUS:**
ACTIVE

**PROPERTY:**
ITEM NO: 1          STATUS: 11 - Evidence (Including Other Seized Property and Tools)
PROPERTY DESCRIPTION: 3304 - RAPE KIT - Rape Kit
RECOVERED BY:                              RECOVERED DATE/TIME:
RECOVERED FROM:
DRUG QUANTITY/MEASURE:                     COUNT: 1

VALUE:                                     COLOR:
MANUFACTURER:                              MODEL:
SN/VIN:                                    LICENSE NO:
ALERT:                                     VEHICLE YEAR:
DESCRIPTION: Rape Kit

**PROPERTY NOTES:**
Kit was done at Covenant ER, seized by R/O and tagged as property in the SPD property room.

EXHIBIT "B"

Case 2:15-cv-11074-PDB-DRG   ECF No. 7   filed 02/03/17   PageID.94   Page 68 of 95
statement of: Bobbie Johnson
Case # 08-5843
Page 16 of 23

was going to do some stuff for him so my daddy was working for him too that day but we were at different houses.

Q:    What's your dad's name?

A:    Bobby Johnson

Q:    Do you know his date of birth?

A:    Uh, he was born in May ... I mean March.

Q:    How old is he do you think?

A:    My daddy is 42 ... March 7, 1966 ... yep.

Q:    Okay, and he called you and then uh Charles called you back in the house?

A:    Yeah, he called me back in the house and my dad was there now and uh he was like, "Uh, you can come here tomorrow and help uh sand the floors." I was like, "No." He was like, "You going to come back?" I said, "No, I'll think about it. I have stuff to do tomorrow." He got in the car and left.

Q:    Okay, now when did you tell somebody?

A:    Um, she asked me like later on that day cause I really didn't want to tell nobody like ... well it had to be around like 10 something or the next morning probably. It was ... yeah it had to be around 10 something. She was like, "What's wrong with you." She was like, "What happened?" She was like, "Charles did you know what huh?" I was like, "Yeah, he did." I said, "He raped me." And she was like, "Oh." And I was like, "Don't tell my daddy. I don't want him to know yet." And the next day I went to the hospital and told him.

Q:    Okay, did Charles ever tell you not to say anything or?

A:    No

Q:    So Charles never told you, "Don't say anything?

A:    He just said ... he said, "You going to be all right." Them was his last words and I never talked to him afterwards.

Q:    Okay, um did Charles ever come over to Vernice or Verice's house ... Vercie's house?

EXHIBIT "C"

**ɳAW POLICE DEPARTMENT**
FOLLOW-UP REPORT

| | |
|---|---|
| Report Date/Time: **7/15/2008 5:25:39 PM** | Case No. 0871705843<br>Report No. 0871705843.2<br>Case Status INACTIVE |

**NARRATIVE:**

INFO:

On 7/15/08, I was assigned this case for further investigation by D/Sgt Vanderhaar.  I reviewed the case report.

ATTEMPTS TO CONTACT VICTIM:

On 7/15/08, 1000 hrs, and at 1446 hrs, I attempted to contact the victim via tx (401-0630).  I left a message on the answering machine.

EVIDENCE TO MSP CRIME LAB:

On 7/15/08, I signed the CSC kit out of the SPD property room.  I opened the kit and removed the pink copy of the FSD form 97, MSP Michigan Medical Forensic Examination Record (sexual assault examination form) for my records.  I then resealed the CSC kit.

On 7/15/08, 1408 hrs, I submitted the CSC kit to the MSP Crime Lab for analysis.  (Jodi Gardner, Lab #BP08-3559).

On 7/17/08, I requested the property room staff take the victim's panties and pants to the MSP Lab for analysis.  On 7/18/08, Angela Howie (property room) took the above evidence to the Crime Lab.

INVESTIGATOR'S ACTIONS:

On 7/15/08, 1400 hrs, I drove past 908 Reed, where I obtained a description.  I observed a dark colored Jeep vehicle (MII Reg # BFM9196) parked against the curb in front of the house.  LEIN ████████████

On 7/15/08, I spoke to CPA Gave via tx.  He advised that it was too late to seek a search warrant for evidence in 908 Reed.

INTERVIEW VICTIM:  (Bobbie Johnson)

On 7/16/08, 1407 hrs, I conducted a recorded interview of Bobbie Johnson at SPD.  See transcript of recording.

Johnson stated that she was helping the suspect with his remodeling project at 908 Reed St.  Johnson stated that the suspect lured her to the basement by telling her that he had some work for her to do there.  She stated that the suspect grabbed her arms and began sucking on her neck.  She stated that he pulled her shirt and bra up.  He then began to fondle and suck her breasts.  The suspect fondled her vagina and turned her around.  The suspect then fondled her vagina as he stood behind her.  The suspect then placed his penis inside of her vagina and had intercourse with her from behind.  She stated that he stopped when Vercie Cooper entered the house and began calling her name.  Johnson stated that the suspect pulled his penis out and ejaculated on the floor.  She stated that some of his semen dripped on her white capri type pants.  She believes that the semen dripped on the side of her left pant leg.  Johnson brought this pair of pants, and the black panties she was wearing at the time of the incident, to SPD and turned them

| NetRMS_MSPCR.rtf<br>v2f | Reporting Officer:  DETECTIVE TIMOTHY FINK | |
|---|---|---|
| Page 3 of 8 | Approved By:  SERGEANT JOSEPH DUTOI<br>Date Approved:  12/8/2009 7:32:53 AM | Printed: May 7, 2014 - 10:39 AM |

EXHIBIT "D"

Statement of: Bobbie Johnson
Case # 08-5843
Page 14 of 23

A:     He grabbed me by my arm like just shove me, grab me and he grabbed me by
        the arm and after that he was like, "Come here." Then he had me pressed up
        against the counters like this way and he was like, "You know I've been wanting
        this for a long time." I was like, "Stop no. It's wrong. I call you my uncle and."

Q:     How was he holding you face to face or is he?

A:     Yeah, we were face to face. He was sucking on my neck and then he starts …
        he took … first of all … first he um pulled my shirt up and I just kept trying to pull
        my shirt down cause I didn't want him touching me and he just grabbed my arms
        and started sucking on my breast and.

Q:     Okay, what he pulled the shirt up you said?

A:     Yeah, he pulled my shirt and started.

Q:     Were you wearing a bra?

A:     Yeah

Q:     Okay, did he pull that up too or?

A:     Uh uh, he started sucking on my breast and after that he was rubbing my
        stomach trying to get my pants down and like I was like trying to budge his hands
        and he would still do it. Then he got my pants down a little bit and he turned me
        around and had me with one hand and pulling his, unbuckling, unlatched his
        pants and pulled his pants down and inserted his penis in.

Q:     Okay, did he touch you? I mean he, he … you say he sucked your breast.

A:     Uh uh

Q:     And then he turned you around and he got your pants down and he inserted his
        penis, did he touch you anywhere else while he was doing this?

A:     Yeah kept doing this and he kept doing that I don't …

Q:     You say doing that just for the to take … rubbing your vaginal area?

A:     Yeah, yeah

Q:     Okay

A:     He just kept doing that.

EXHIBIT "E"

Statement of: Bobbie Johnson
Case # 08-5843
Page 5 of 23

Q:   You walked there or did you drive?

A:   No, my friend dropped me off.

Q:   Okay, who is your friend that dropped you off?

A:   Uh, her name is ████████.

Q:   Do you know her address of her phone number?

A:   I have her phone number in my phone.

Q:   How old is ██████?

A:   I think she's 16 or 17.  We have school together.  Her number is ███ ...

Q:   Okay

A:   ███

Q:   Okay

A:   ███

Q:   All right, so she dropped you off right after school?

A:   Ah ha

Q:   And when did you got to the house did you walk in or did you knock or how do you usually?

A:   The door ... the screen door was open.  They always in the living room, which is the front of the house so there is no window, but there wasn't a curtain so he say ... he was like, "Come in." I knocked at the door first.

Q:   Now you said they was there somebody else there with him?

A:   It was a painter there an electrician I think from the street.  I don't know their names.

Q:   Kind of like handyman type painters?

A:   Yeah, people he associate with.

EXHIBIT "F"

Q:    From behind or?

A:    Yeah, he was doing it from the front too when I had my pants on.

Q:    Did he put his penis in your vagina?

A:    Ah ha

Q:    Okay

A:    From the back and he just kept repeating, "You know I've been wanting this," and I'm steady telling him, "No stop. It's wrong and all type of stuff." It was crazy.

Q:    Did you scream or anything?

A:    Pretty much I mean my voice was hoarse that day, so I really couldn't scream aloud but I was … I got a high voice so I was like, "Stop, stop … no, no." And I don't know. It was crazy. He wouldn't stop. He just kept going talking about some, you know, I wanted this. I got it now and it was crazy. The only reason he stop because they drive … these people pulled up and she had … the lady that I went today.

Q:    Um hmm

A:    She had to show them where I was and she came in the house. She called my name. She was like, "Bobbie, anybody in here?"

Q:    Okay, so who was calling your name? Is that Bernice?

A:    Vercie

Q:    Vercie? Okay

A:    She was like, "Bobbie, is anybody in here?" And he pulled up his clothes and I ran up the steps and she was like, "What's wrong with you?" I said, "Nothing I'm all right." She was like, "What's wrong with you?" She like, "I know something wrong." I was like, "Nothing, I'm fine." And after I got my test results from the H.I.V. people I sat in the car and cried and he came to the car and he was like … but I dried my face before he got there and he was like … he was like, "You will be all right." I said, "No that was foul. You ain't have to do that." I said, "I called you my uncle and you just going to do some stuff like that and think you going to get away with it." And then he called me back in the house cause my daddy was there. My daddy pulled up and he was talking to my daddy because my daddy

EXHIBIT "G"

Statement of: Bobbie Johnson
Case # 08-5843
Page 20 of 23

A:     Yeah, that kind of ride.

Q:     Okay, yeah cause Cedar Point owns ... owns Michigan Adventure so they do a
       lot of the same type of rides and that's cool.

A:     Um hmm

Q:     All right, did uh ... did the guy who was painting did he seem like he knew what
       was going on at all or could you tell?

A:     I mean he was a little flirtatious too being old cause he was like ... what did he
       say?  I was like teasing him.  I was like, "Uh huh I paint better than you."

Q:     Um hmm

A:     He was like, "You look better than me so."

Q:     Yeah

A:     ... you might just paint better than me."

Q:     Okay, you don't have any idea whether he knew what was going on in the
       basement at all?

A:     No

Q:     Nothing like that?  Okay, when you walked out of the house was he still in the
       house?

A:     Yeah, he was in the house and when my daddy got there everybody sat on ...
       everybody sat on the porch so the painter was standing above me.  Charles was
       sitting right like next to me.

Q:     Yeah

A:     Yeah, he was sitting next to me.  My dad was right here and Vercie was right
       here so everybody was in a little circle.

Q:     Okay, all right but when it happened it was just you, the painter guy, and Charles
       in the house.

A:     Uh huh

Q:     And then you and Charles in the basement.

EXHIBIT "H"

Statement of: Jamie Allen
Case # 08-5843
Page 11 of 18

Q:      Yeah I mean when she was ...

A:      Did she say anything to me about?

Q:      I mean was she talking to you before?  I mean before even in the basement
        then?  I mean how was she acting towards you?

A:      Just normal, you know, because when she left I was still working.

Q:      Okay

A:      You know?  And if I go outside she left with her stepmother.  You know?

Q:      Okay, I mean before that though.  Before I mean ... before he even ... I guess
        while Dexter was gone.  I guess I understand he was gone for a little bit ... went
        to Lowe's or something.

A:      Oh yeah, yeah.

Q:      How was she acting towards you?

A:      That left me, her ... that left me, her and who else was there?  Was the
        electricians ... yeah the electricians ... yeah cause we took a break and ate and
        me and uh ...

Q:      Yeah

A:      ... me and uh, (inaudible), which is his cousin was on the porch and she sat in
        the house and then that's when everybody came there.

Q:      No I mean when she's painting there with you or she's in the room with you how
        was she acting to you?

A:      Oh, I mean she was just painting.

Q:      Okay

A:      You know, that's all.  Dexter was in there too.

Q:      Did she ever flirt with you or anything?

A:      No, no, no ... uh, uh ... no.

Q:      Did she ever come on to you?

Statement of: Jamie Allen
Case # 08-5843
**Page** 12 of 18

A:      No, no, no, no, no, no

Q:      Did she ever rub her body against you?

A:      No, no, no, no, no, no

Q:      I mean I'm not saying you did anything wrong.

A:      No, no, no, no … no, she didn't.

Q:      Did she ever rub her breast against you or her butt against you?

A:      No, no, no, no, no … she just tripping, bumped into me and that was it.

Q:      Okay

A:      But he was standing right there too.

Q:      But she didn't do anything to make you think she was flirting with you or wanted to try to entice you or nothing?

A:      Oh no, no, no, no uh, uh … no, no, no … uh, uh … no, uh, uh

Q:      Okay

A:      Because I just met her that day and the thing is, is that her and Dexter were doing most of the talking.

Q:      Okay

A:      You understand?

Q:      Sure

A:      You know, so I just met her.    (inaudible)

Q:      Okay

A:      You know?

Q:      You didn't see her doing anything like that to him?

A:      No

EXHIBIT "I"



10-11-11

I.D. Mtg @ SPD
10-17-11
9:00

08-5843

for A.P.A. Barnes,
Zatn Phase 3
P.O: Charles Ingram
C.S.O: ASAP!

Jamie E. Allen

James E. Maxwell

John Moten — St. Pauls Twnsh Village 992-2186
His security guard fried for activity
with Bobbie Johnson. John had to
speak with Bobbie about stalking Sec. Officer

Did they get P.I.P?
Did they get I.T.I.U. by Is tommy who's when
What was there B???? Guy in Court.

EXHIBIT "J"



**STATE OF MICHIGAN**
# DEPARTMENT OF STATE POLICE
### FORENSIC SCIENCE DIVISION
Lansing Laboratory
7320 N. Canal Rd
Lansing, MI 48913
(517) 322-6600
FAX (517) 322-5508

## LABORATORY REPORT

| | | | | | |
|---|---|---|---|---|---|
| Laboratory No. | : | BP08-3559 | Record No. | : | 3 |
| Investigating Ofcr. | : | Tim Fink, Det. | Date Received | : | July 31, 2008 |
| Agency | : | Saginaw Police Department | Time Received | : | 2:03 p.m. |
| Agency No. | : | 08-5843 | Date Completed | : | October 22, 2009 |

**Nature of Offense:**

1100-1 - Sexual Assault CSC 1st

**Victim:**

Johnson, Bobbie Suett

**Suspect:**

Ingram, Charles Dexter

**Evidence:**

BP08-3559-1-1A        1- extraction tube containing known DNA (buccal swab) from Bobbie Johnson

BP08-3559-2A    1- extraction tube containing cuttings taken from stain on back of underwear

BP08-3559-2A-S        sperm fraction from back of underwear

BP08-3559-2A-E        epithelial fraction from back of underwear

BP08-3559-4A    1- extraction tube containing known DNA (buccal swab) from Charles Ingram

**Results of Examination:**

Deoxyribonucleic acid (DNA) recovered from the above submitted samples was processed using the polymerase chain reaction (PCR) and the AmpFlSTR® Profiler Plus® and COfiler® amplification kits (genetic loci D3S1358, vWA, FGA, Amelogenin, D8S1179, D21S11, D18S51, D5S818, D13S317, D7S820, D16S539, TH01, TPOX and CSF1PO).

**Conclusions:**

The DNA profile from item BP08-3559-2A-E (epithelial fraction from back of underwear) matches the DNA profile from item BP08-3559-1-1A (1- extraction tube containing known DNA (buccal swab) from Bobbie Johnson).

The DNA types obtained from item BP08-3559-2A-S (sperm fraction from back of underwear) indicate that more than one donor is associated with this sample.

**The relevant supporting data upon which the expert opinion or inference was made are available for review/inspection.**

STATE OF MICHIGAN
IN THE CIRCUIT COURT FOR THE COUNTY OF SAGINAW

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiffs,

v.                                                         File No.  08-031317-FH

CHARLES DEXTER INGRAM,

Defendant.

_____/

## OPINION AND ORDER OF THE COURT

At a session of said Court, held at the Court House in the City of Saginaw, County of Saginaw, and State of Michigan, this 1st day of December 2015;

PRESENT: HONORABLE ROBERT L. KACZMAREK, Circuit Judge

This matter comes before the Court on Defendant's Motion for Relief from Judgment pursuant to MCR 6.500 *et seq.*

### OPINION

#### I. Background

On December 2, 2011, Defendant Charles Ingram was convicted at jury trial of one count of the crime of Third Degree Criminal Sexual Conduct ("CSC 3rd") and two counts of the crime of Fourth Degree Criminal Sexual Conduct ("CSC 4th").  On January 30, 2012, the Court sentenced Defendant to a minimum of 7 years, maximum of 15 years, for the CSC 3rd conviction and a minimum of 13 months and maximum of 2 years for the CSC 4th convictions.  Defendant subsequently brought a motion for new trial which was denied by this Court on October 3, 2012.    The Court of Appeals affirmed those convictions in an unpublished opinion dated July 16, 2013 and our Supreme Court denied leave to appeal. *People v. Ingram,* Docket No. 309035, 2013 WL 3717793 (Mich.App.,

1

A TRUE COPY
Susan Kaltenbach, Clerk

July 16, 2015), lv. den. 495 Mich. 915 (2013).  Defendant now moves for post-appellate relief from judgment.

## II. Discussion

### A. Standard of Review

In a motion for relief from judgment, Defendant bears the burden of establishing entitlement to the relief requested.  MCR 6.508(D).  A court may not grant relief if the motion alleges grounds for relief which were decided against the defendant in a prior appeal, unless the defendant establishes that a retroactive change in the law has undermined the prior decision.  MCR 6.508(D)(2).  Additionally, relief may not be granted where the motion:

> (3) alleges grounds for relief, other than jurisdictional defects, which could have been raised on appeal from the conviction and sentence or in a prior motion under this subchapter, unless the defendant demonstrates
>
> (a) good cause for failure to raise such grounds on appeal or in the prior motion, and
>
> (b) actual prejudice from the alleged irregularities that support the claim for relief…

MCR 6.508(D)(3).

In a conviction following a trial, "actual prejudice" means "but for the alleged error, the defendant would have had a reasonably likely chance of acquittal." MCR 6.508(D)(3)(b)(i).  Actual prejudice also occurs in any case where there is an irregularity so offensive to the maintenance of a sound judicial process that the conviction should not be allowed to stand.  MCR 6.508(D)(3)(b)(iii).

To the extent some of the issues raised in Defendant's motion could have been raised on appeal, he attempts to satisfy the good cause requirement by arguing that appellate counsel was ineffective in his services.

2

## B. Grounds for Relief from Judgment

### 1. Insufficient Evidence and/or Perjured Testimony

With his first claim of error, Defendant appears to contend that there was insufficient evidence to convict him of the offenses and, in a seemingly contradictory vein, that the testimonial evidence which supports his convictions should be regarded as perjured.

Insofar as Defendant makes any argument that the evidence at trial was insufficient to support his convictions, or that his version of the events is more plausible, the Court of Appeals has already rejected such argument.   As they explained:

> Nothing about BJ's description of the attack can be characterized as "patently incredible" or contrary to "physical realities." Defense counsel challenged BJ's description of the assault, and she continued to maintain that defendant restrained her while at the same time engaging in sexual contact and sexual penetration with her. During a police interview, defendant denied having sexual intercourse with BJ, but he testified that he did engage in sexual intercourse with her, but that the intercourse was consensual. It was ultimately for the jury to determine whose testimony to believe, and we will not interfere with the jury's role in assessing witness credibility. *Harrison,* 283 Mich.App at 378. Moreover, a victim's testimony alone is sufficient to establish criminal sexual conduct, and such testimony need not be corroborated. MCL 750.520h; *People v. Phelps,* 288 Mich.App 123, 132; 791 NW2d 732 (2010). Accordingly, the evidence was sufficient to support defendant's convictions, and the trial court did not err by denying defendant's motion for a directed verdict of acquittal.
>
> *People v. Ingram,* Docket No. 309035, 2013 WL 3717793, at \*2 (Mich. Ct. App. July 16, 2013), lv. den495 Mich. 915 (2013) (underlined emphasis added).

Pursuant to MCR 6.508(D)(2), this Court may not grant a motion for relief from judgment on grounds that were decided against Defendant on appeal.  Therefore, no relief is warranted on the ground that there was insufficient evidence to support the convictions.

Alternatively, Defendant claims that this issue should be regarded as only partially raised on appeal because it was not previously raised as a *Napue* violation

3

involving alleged perjury.[1]  However, Defendant's attempt to recast his attack on the victim's testimony as one of alleged perjury, rather than insufficient evidence, is unpersuasive. Already implicit in the appellate arguments attacking the credibility of the victim's testimony was the notion that the victim's testimony in court was untruthful.

The gist of Defendant's arguments in the present motion is that the victim's testimony should be deemed perjured simply because he thinks it should have been disbelieved.   To that end, his "perjury" arguments appear to consist of such matters as arguing alleged discrepancies in the number of bruises she testified to at trial as opposed to documented in the medical records at a particular point in time, that another witness testified as to not hearing her screams as she testified, that the (latest) version of events he gave at trial as to what he claimed happened should have been found "more plausible", and that the victim's version lacked "scientific support."  Such argument fails to make any showing of perjury at his trial, but merely rehashes rejected arguments that go to the credibility and weight of the evidence.  It was for the jury to resolve such credibility and weight issues in determining whether there was sufficient evidence to convict Defendant of the charged offenses. They did so in returning unanimous guilty verdicts against the Defendant.  It is not for this Court to subvert the role of the jury by setting aside their considered credibility determinations.  Entitlement to relief from judgment has not been shown.

### 2. Double Jeopardy Violation

Defendant next argues that his convictions for CSC 3rd and CSC 4th violate the U.S. Constitution's Fifth Amendment protection against double jeopardy.  Defendant is mistaken that any double jeopardy issue exists.  As explained by our Court of Appeals:

---

[1] Referring to *Napue v. Illinois*, 360 U.S. 264, 269, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959).

> To determine whether a defendant has been subjected to multiple punishments for the "same offense," we must first look to determine whether the Legislature expressed a clear intention that multiple punishments be imposed. *People v. Smith,* 478 Mich. 292, 316, 733 N.W.2d 351 (2007). Where the Legislature clearly intends to impose such multiple punishments, there is no double jeopardy violation. *Id.* Where the Legislature has not clearly expressed an intention to impose multiple punishments, the elements of the offenses must be compared using the *Blockburger* test. *Id.* at 316–318, 733 N.W.2d 351.
>
> Under the *Blockburger* test, if each offense "requires proof of a fact which the other does not" then there is no violation of double jeopardy. *Id.* at 311, 52 S.Ct. 180 (quotation marks and citations omitted). However, because the *Blockburger* test is simply a tool used to ascertain legislative intent, the focus must be on a comparison of the abstract legal elements of the offenses and not on the particular facts of the case. *People v. Ream,* 481 Mich. 223, 238, 750 N.W.2d 536 (2008).
>
> *People v. Garland,* 286 Mich. App. 1, 4-5, 777 N.W.2d 732, 734-35 (2009) (footnote omitted).

As the Legislature did not clearly express its intention to impose multiple punishments in the CSC chapter, MCL 750.520 *et seq.,* the Court applies the *Blockburger* test.[2] *Id.* at 5.

Defendant fails to show the elements of the crime of CSC 3rd and the crime of CSC 4th involve the same factual elements. Indeed, the elements of the crimes are separate and distinct from one another. In enacting the CSC 3rd statute, our Legislature criminalized the act of "sexual penetration with another person" under certain circumstances. MCL 750.520d(1). On the other hand, CSC 4th criminalizes an act of "sexual contact with another person" under certain circumstances. MCL 750.520e(1). The terms "sexual penetration" and "sexual contact", in turn, are expressly defined by the CSC chapter and describe different conduct. See MCR 750.520a(q) & (r). Thus a CSC 3rd conviction requires proof of the fact an act of "sexual penetration" took place while a CSC 3rd conviction requires different proof of an act of "sexual contact." Because each offense requires proof of a fact that other does not, no double jeopardy issue exists.

---

[2] The "*Blockburger*" test refers to the test derived from *Blockburger v. United States,* 284 U.S. 299, 52 S.Ct. 180, 76 L.Ed. 306 (1932).

In this case, the evidence shows Defendant was convicted of three CSC offenses arising out of three separate criminal acts: his sexual penetration of the victim, his sexual contact of the victims breasts, and his sexual contact of her vagina. Defendant was not convicted of the "same offense" twice, as each act for which he was convicted constitutes a separate offense.   No relief from judgment is warranted.

### 3.  Guidelines Scoring

Defendant further contends that prior record variable 7 ("PRV 7") and offense variable 13 ("OV 13") were improperly scored in calculating his sentencing guidelines. Defendant's argument for a rescoring of these variables is conditioned on whether his double jeopardy argument is successful. As Defendant's double jeopardy argument lacks merit, there is no basis for treating his three convictions as only one for purposes of rescoring these guidelines variables.  Relief from judgment is not warranted.

### 4.  Sex Offender Registration Act

Defendant also asserts that Michigan's Sex Offender Registration Act ("SORA"), MCL 28.721 *et seq.*, is unconstitutional as a cruel and unusual punishment and violates due process of law.   To the extent Defendant suggests this Court should hold any ruling on this issue in abeyance, the rules of MCR 6.500 *et seq.* do not provide for holding portions of motions for relief from judgment indefinitely when they are not supported by existing law.  Moreover, if an applicable change does occur, MCR 6.502(G)(2) specifies that a "retroactive change in law" occurring after the first motion for relief from judgment was decided is a ground for filing another motion for relief from judgment.  Therefore, the Court will proceed to resolve this issue immediately.

Michigan Courts have repeatedly found that compliance with SORA does not constitute a cruel and unusual punishment.  Compliance with the requirements of SORA

does not constitute a "punishment" in the constitutional sense.  Indeed, our Court of Appeals "has consistently ruled that SORA's registration requirement, as applied to adult offenders, does not constitute punishment and is, instead, structured or focused on the protection of the public." *People v. Bosca*, 310 Mich.App. 1, 33 (2015); see also *People v. Pennington*, 240 Mich.App. 188, 193, 610 N.W.2d 608, 610 (2000)("We disagree with defendant's argument that the potential ramifications of complying with the act constitute punishment"); *People v. Temelkoski*, 307 Mich.App. 241, 270-271, 859 N.W.2d 743, 761 (2014)("SORA has not been regarded in our history and traditions as punishment, it does not impose affirmative disabilities or restraints, it does not promote the traditional aims of punishment, and it has a rational connection to a nonpunitive purpose and is not excessive with respect to this purpose.").  Therefore, Defendant's argument that requiring him to comply with SORA constitutes a cruel and unusual punishment is without legal support.

Similarly, no due process rights, be they procedural or substantive, are implicated by requiring Defendant, an adult sex offender, to comply with SORA.  *People v. Bosca*, - 310 Mich.App. 1 (2015); *People v. Golba*, 273 Mich.App. 603, 619-620, 729 N.W.2d 916, 926-927 (2007).  Entitlement to relief from judgment has not been shown.

### 5. Ineffective Assistance of Counsel

Finally, Defendant contends that his trial and appellate attorneys were ineffective in failing to raise the grounds asserted in the presented motion.  "The test for ineffective assistance of appellate counsel is the same as that for trial counsel." *People v. Pratt*, 254 Mich.App. 425, 430 (2002).  In considering claims of ineffective assistance of counsel, effective assistance of counsel is presumed and the defendant bears the heavy burden of proving otherwise. *People v. Mack*, 265 Mich.App 122, 129; 695 NW2d 342 (2005).  To

7

prevail, a Defendant must establish: (1) his counsel's performance was deficient under an objective standard of reasonableness and (2) the deficiency was prejudicial to defendant to the extent that, but for counsel's error, the result of the proceedings would have been different. *Id.* Appellate counsel is not ineffective for winnowing out weak arguments or failing to advocate a meritless position. *Pratt*, 265 Mich.App. at 130 (2005).

Here, none of the grounds raised in the present have any legal merit and neither trial nor appellate counsel is ineffective for failing to raise these grounds devoid of legal merit. Trial counsel did vigorously challenge the credibility of the victim's testimony by arguing alleged inconsistencies and discrepancies during closing argument. See TT.III 93-98.[3] Additionally, because Defendant has failed to establish any meritorious claim of error not raised by his appellate attorney, he has not shown that appellate counsel failed to raise an error that would have resulted in a reasonably likely chance of acquittal. Actual prejudice warranting relief from judgment has not been shown.

## ORDER

Accordingly, the Court **DENIES** Defendant's Motion for Relief from Judgment.

**It is so ordered.**

ROBERT L. KACZMAREK
Circuit Judge
10th Judicial Circuit

Dated:  December 1, 2015.

---

[3] "TT.III" refers to Trial Transcript, Vol. III.

8

**MICHIGAN COURT
OF
APPEALS**

## Court of Appeals, State of Michigan

## ORDER

People of MI v Charles Dexter Ingram

Docket No.     332098

LC No.          08-031317-FH

Michael J. Talbot
Presiding Judge

Kurtis T. Wilder

Michael J. Riordan
Judges

The Court orders that the motion to waive fees is GRANTED for this case only.

The delayed application for leave to appeal is DENIED because defendant failed to establish that the trial court erred in denying his motion for relief from judgment.

A true copy entered and certified by Jerome W. Zimmer Jr., Chief Clerk, on

JUL 2 5 2016
_____
Date

_____
Chief Clerk

**APPENDIX C**

# Order

**MICHIGAN SUPREME COURT**

**Michigan Supreme Court**
**Lansing, Michigan**

January 5, 2017

Robert P. Young, Jr.,
Chief Justice

Stephen J. Markman
Brian K. Zahra
Bridget M. McCormack
David F. Viviano
Richard H. Bernstein
Joan L. Larsen,
Justices

154300

PEOPLE OF THE STATE OF MICHIGAN,
     Plaintiff-Appellee,

v

                                   SC: 154300
                                   COA: 332098

CHARLES DEXTER INGRAM,
     Defendant-Appellant.

                                   Saginaw CC: 08-031317-FH

_____/

     On order of the Court, the application for leave to appeal the July 25, 2016 order of the Court of Appeals is considered, and it is DENIED, because the defendant has failed to meet the burden of establishing entitlement to relief under MCR 6.508(D).



     I, Larry S. Royster, Clerk of the Michigan Supreme Court, certify that the foregoing is a true and complete copy of the order entered at the direction of the Court.

January 5, 2017



Clerk

s1212